### HENRY R. HINCKLEY vs. UNION PACIFIC RAILROAD COMPANY.

Suffolk.    March 5. — June 30, 1880.    ENDICOTT & SOULE, JJ., absent.

The owner of a stolen interest coupon payable to bearer, and which has not been paid by the promisor, is entitled to judgment in an action against the promisor, on filing a bond of indemnity, conditioned to save the defendant harmless against all lawful claims by any other person, and against all costs and expenses by reason of such claims.

The promisor of an interest coupon payable to bearer, and distinguishable from others by a number, who, after notice that it has been stolen, pays it when overdue to the person presenting it, without any inquiry as to his title, is liable to the true owner therefor; although the notice did not contain an offer of a bond of indemnity; although the promisor is a corporation having a very large number of such coupons outstanding, has been in the habit of paying overdue coupons as if still current, and, after the payment, gave notice to the true owner of the name of the person to whom payment had been made; and although the treasury department of the United States pays coupons on bonds, issued by the government and payable to bearer, to the person presenting them, without regard to notices that such coupons had been stolen.

CONTRACT in two counts. Writ dated May 13, 1879. The first count was upon the following instrument, declared on as a promissory note : " The Union Pacific Railroad Company will pay the bearer at its office in the city of Boston on the first day of March, A. D. 1876, forty dollars current money of the United States, or seven pounds British sterling money, at the option of the holder, at the banking-house of Messrs. Morton, Rose & Co., London, England, being the interest due at that date on its Sinking Fund Bond 5136.    E. H. Rollins, Treas."

On the back of this instrument was the figure " 5."

The second count was on an instrument precisely similar to the above, except that the number of the bond was 5135 instead of 5136, and it was also declared on as a promissory note.

The defendant filed no answer ; but the case was submitted to the Superior Court, and, after judgment for the defendant, to this court on appeal, on agreed facts, which, after stating that the pleadings were made a part thereof, was in substance as follows :

On January 26, 1876, the plaintiff was the owner of two bonds, issued by the defendant on September 1, 1873, numbered

5135 and 5136 respectively, each bearing on its face the words "Sinking Fund Mortgage Bond," and by the terms of which the defendant promised to pay to the holder $1000 in gold coin of the United States, or £200, twenty years from date, with interest at the rate of eight per cent per annum, payable semi-annually. Attached to each of these bonds, and printed on the same sheet with it, were originally forty coupons of the form set forth in the first count of the declaration, the first coupon being dated March 1, 1874, and each succeeding coupon bearing a date six months subsequent to that in the preceding coupon. The several coupons were numbered on the back from 1 to 40, and bore on their face the number of the bond to which they were attached.

Previously to January 26, 1876, the first four coupons on each bond had been cut off, and had been paid by the defendant. On the morning of that day, these bonds, with many other securities, were stolen from the Northampton National Bank, where they had been deposited by the plaintiff in a box; and the plaintiff, after diligent search, has been unable to recover the bonds or any of the coupons. At the same time, forty-two other bonds similar to those above mentioned were stolen from the plaintiff.

On February 26, 1876, the plaintiff sent to the defendant's treasurer the following notice: "Northampton, Mass., Feb. 26, 1876. E. H. Rollins, Esq., Treasurer Union Pacific Railroad Company, Boston. My dear Sir: I lost by the recent robbery of the Northampton National Bank, 42,000 Union Pacific Railroad Sinking Fund bonds, Nos. 5113 to 5154, inclusive. The bonds were originally issued to me, and have never been on the market. If you could stop payment of the coupons due on the 1st of March, or notify me by whom any of such coupons are presented, I should be exceedingly obliged to you. The Ohio and Mississippi Railroad Company have promised Mr. Edwards, president of the bank, to stop payment of any of the stolen coupons of their bonds whose numbers have been given them. I shall be very thankful for any protection you can offer me in the matter. Respectfully yours, Henry R. Hinckley."

The coupon declared on in the first count was attached to the bond numbered 5136. Neither the plaintiff nor the defendant

knows where that bond and coupons are. No coupon of that bond has, since January 27, 1876, been presented to the defendant for payment.

On April 18, 1879, the plaintiff (who had previously recovered twenty-five of the stolen bonds, and had replevied from the Merchants' Bank, of Boston, some of the coupons attached to certain of the other bonds, which coupons, after such replevin, he presented to the defendant, who paid them, taking from the plaintiff a bond of indemnity against the claim of the Merchants' Bank or other owner of said coupons) made a formal demand upon the defendant for the payment of the amounts due on those coupons which were then due and which he had not then presented, offering to give a bond of indemnity. Among the coupons included in this demand were those belonging to bonds 5135 and 5136.

On April 21, 1879, Messrs. Kidder, Peabody & Co., bankers, presented to the Union Trust Company, the agent of the defendant in New York, in one lot, fourteen coupons : seven belonging to the above-described bond numbered 5135, and due on March 1, 1876, September 1, 1876, March 1, 1877, September 1, 1877, March 1, 1878, September 1, 1878, and March 1, 1879, respectively, and seven bearing the same dates and belonging to bond 5134, which was one of the bonds stolen and never recovered. These fourteen coupons were covered by the demand made on April 18, 1879. The Union Trust Company (to whom a copy of the plaintiff's letter of February 26 had been duly transmitted, together with a letter from the defendant dated February 29, 1876, requesting the Union Trust Company to communicate with the plaintiff, if the coupons were presented for payment) paid these coupons without making any inquiry as to the title of the holders.

Some time after the above notice by the plaintiff to the defendant of his loss, he informed the defendant that, by negotiation with the persons who had stolen his bonds, he had recovered twenty-five of the lost bonds, and he subsequently informed the defendant that he had held further negotiations for the restoration of the residue of the bonds, in which negotiation he had offered to pay the sum of $6000 for such restoration, but that the sum of $9000 or $10,000 was demanded of him, which he

had declined to pay, and he was now sorry that he had so declined. Subsequently, and about the time of the date thereof, the plaintiff sent the defendant a postal card, headed "Stolen bonds of H. R. Hinckley, Northampton, Mass.," under which were the words "Union Pacific S. F. 8%," and the numbers of nineteen bonds, among which were the numbers 5135 and 5136; and the following signed by the plaintiff, with the date January 7, 1878: "The above are the balance of a lot of $42,000 — Nos. 5113 to 5554 inclusive — original bonds never put on the market, which were stolen from the Northampton National Bank, of Northampton, Mass., on the night of Jan. 26 and 27, 1876. The other $25,000 have been recovered. All parties are cautioned against negotiating the above numbers."

Before the commencement of this action, the defendant gave notice to the plaintiff of the date and the name of the persons to whom the defendant paid the coupon declared on in the second count of the declaration.

A circular of the treasury department of the United States and a statement by the treasurer of the defendant and of the secretary of the Union Trust Company, the trustee named in the mortgage deed given to secure the bonds in question, were to form part of the agreed facts, if admissible in evidence, and not otherwise.

The circular of the treasury department was as follows "Treasury Department, April 27, 1867. In consequence of the increasing trouble, wholly without practical benefit, arising from notices which are constantly received at the department respecting the loss of coupon bonds which are payable to bearer, and of treasury-notes issued and remaining in blank at the time of loss, it becomes necessary to give this public notice, that the government cannot protect, and will not undertake to protect, the owners of such bonds and notes against the consequences of their own fault or misfortune. Hereafter, all bonds, notes and coupons, payable to bearer, and treasury-notes issued and remaining in blank, will be paid to the party presenting them, in pursuance of the regulations of the department, in the course of regular business; and no attention will be paid to caveats which may be filed for the purpose of preventing such payment. H McCulloch, Secretary of the Treasury."

The statement of the treasurer of the defendant and of the secretary of the Union Trust Company was as follows : " It happens once a week, on an average, that a person will present for payment the coupons of a bond or of several bonds, which coupons are overdue for one or more years, with or without those of intervening dates. Coupons presented after maturity are often presented at dates concurrent with the payment of coupons · from other classes of the company's bonds, which last are just due or just past due. The company pays coupons from first mortgage bonds, $27,231,000; land grant bonds, $6,670,000 ; sinking fund bonds, $12,455,000 ; Omaha Bridge bonds, $2,104,000." Annexed to this statement were schedules in ·support of the statement that coupons to a large amount were not presented for payment until long overdue.

If these facts showed a defence to the claims set forth in the .first and second counts, judgment was to be entered for the defendant on both counts. If the facts showed a defence to one count, but not to the other, judgment was to be entered for the defendant on that count, and for the plaintiff on the other; otherwise, judgment for the· plaintiff on both counts. Before judgment for the plaintiff was entered on the first count, he was to execute to the defendant a sufficient bond of indemnity in such form as the court should direct. The judgment to be entered for the plaintiff, if any, was on each count to be $40, with interest from April 18, 1879.

*J. C. Gray, Jr. & W. C. Loring*, (*J. C. Ropes* with them,) for the plaintiff.

*S. Bartlett*, for the defendant.

LORD, J. There is no doubt that the coupons, of which copies are given in the agreed statement of facts, were properly declared on as promissory notes payable to bearer. *Spooner* v. *Holmes*, 102 Mass. 503, 507. It is well settled in this Commonwealth that, when such a negotiable promissory note is stolen from the holder before it is due, the amount of it may be recovered from the maker in an action at law, on filing a sufficient bond for his indemnification. *Fales* v. *Russell*, 16 Pick. 315. The plaintiff is therefore entitled to recover the amount of the coupon declared on in the first count of his declaration, on filing before judgment a sufficient bond of indemnity. The condition of such

bond should be of such tenor as to save harmless the defendant against all lawful claims by any other person on account of the coupon in question, and against all costs and expenses by reason of such claims.

The question which we are called upon by the second count to decide is whether, when a negotiable promissory note payable to bearer has been lost or stolen without the fault or neglect of the owner, and is presented for payment when long overdue, the party liable to pay it is bound by previous notice of the loss to inquire into the title of the *de facto* holder before payment.

It has been argued for the defence that the duty of the promisor in case of the loss of a coupon is a gratuitous duty, analogous to the liability of a gratuitous bailee. We cannot take such a view of this duty. It is true, as the counsel for the defendant maintains, that the liability does not arise from the contract, but from the law outside of the contract; but whatever that liability may be, it is part of the law which governs the issue and circulation of negotiable instruments, to which the maker of such instrument subjects himself by the very act of making, and from which he derives the advantage which the negotiability of his promise affords him.

It is conceded that the text-books declare generally that liability ensues from the payment of a lost negotiable instrument after notice of loss, and that no such payment will operate as a discharge against the loser, unless the party presenting the instrument for payment is required before payment to establish a clear title thereto. Chit. Bills, (11th ed.) 188, 278, 279; Bayley on Bills, (2 Am. ed.) 112, 113. Byles on Bills, (13th ed.) 223, 224, 379; 2 Daniel on Negotiable Instruments, (2d ed.) § 1230; Edwards on Bills & Notes, 538; 2 Parsons on Notes & Bills, (2d ed.) 81, 212, 213.

It is alleged for the defence, as a circumstance calculated greatly to weaken the force of this *consensus* of text-writers, that no case has been found in which recovery has actually been had, or even sought, based upon such liability. But it must be remembered that, upon a principle of law so important as this, the absence of decisions may be because of the long and unquestioning acquiescence in the rule; and certainly it is more reasonable thus to construe it than to attribute it to any doubtfulness or

uncertainty as to the rule itself. Such doubt or uncertainty would almost necessarily lead to a judicial decision. It has unquestionably been the practice of the Bank of England for more than a century to regard notices of the loss of their notes, and to delay payment for the purpose of making inquiry into the title of the *de facto* holder. See *Solomons* v. *Bank of England*, 13 East, 135, note; *De la Chaumette* v. *Bank of England*, 2 B. & Ad. 385; *Raphael* v. *Bank of England*, 17 C. B. 161. In *Solomons* v. *Bank of England*, the counsel for the plaintiff did not even contend that the maker of ordinary negotiable paper was not bound by notice of loss, but endeavored to establish a distinction (which was not upheld) in favor of bank-bills, saying, " If once the bank were permitted to withhold payment upon the same grounds as would warrant it in the case of bills of exchange, the confidence of foreigners would be very much shaken, and the circulation of these notes greatly diminished."

In *Miller* v. *Race*, 1 Burr. 452, Lord Mansfield makes the distinction between " securities or documents for debts " and bank-notes, that the latter, by commercial and business use, had become currency or money, universally regarded as such, in England and in other countries, and so were distinguishable from all other evidences of debt. Without defining accurately the rights of owners of commodities, or of choses in action, or of negotiable securities other than bank-notes, his decision is based upon the ground that bank-notes are money, and yet he holds that, even regarding them as money, " It may be both reasonable and customary to stay the payment till inquiry can be made whether the bearer of the note came by it fairly or not."

In *Wheeler* v. *Guild*, 20 Pick. 545, Chief Justice Shaw reviews the authorities on the subject of transfer and payment of lost negotiable instruments, and says: " Most of the same principles and reasons apply alike to transfers and to payments. We think the rules deducible from the cases are these: where a party takes a bill transferable by delivery, not overdue nor otherwise apparently dishonored, for valuable consideration, in the usual course of business, and without notice, actual or constructive, that the holder came by it unlawfully or without title, and has no just right to collect and receive it, the party taking it shall hold it as a valid security, notwithstanding that it has been lost by the

true owner, or stolen from him, or taken by the holder as a mere agent to keep, or for other special purpose, without any authority to collect or transfer it, otherwise he shall not be deemed to have a good title to hold and enforce payment of it, or to withhold the bill itself or the proceeds of it from the party justly entitled. *Bleaden* v. *Charles*, 7 Bing. 246. The same rule applies to payments ; if a bill be paid at maturity, in full, by the acceptor, or other party liable, to a person having a legal title in himself by indorsement, and having the custody and possession of the bill ready to surrender, and the party paying has no notice of any defect of title or authority to receive, the payment will be good.'' There is here the strongest implication of the rule that, if the party paying has notice of any defect of title or authority to receive, the payment will not be good; a rule which is in accordance with other decisions of this court.

It becomes then of great importance to determine what notice is sufficient to charge the party liable to pay with a duty of inquiry into the title of the *de facto* holder. It is clear that such notice need not be accompanied by an offer of indemnity, since the filing of a bond of indemnity merely takes the place of the filing in court of the note or other security, and such filing, as was very clearly stated by Chief Justice Shaw in *Fales* v. *Russell*, *ubi supra*, is not a condition precedent of the right to recover, but simply an acquittance to be made on obtaining judgment. As to the time of the notice, there can be no question that, if at the very moment of payment the payer were reminded that the note which he was about to pay had been lost or stolen, it would be his duty to delay payment till the *de facto* holder had established a title to the instrument. The question before us is whether notice previously given of the loss of a negotiable instrument distinguishable by number or other ear-mark is sufficient to fix upon the party liable to pay a duty of inquiry, and of refusal to pay to a holder who cannot substantiate his title. We think that such previous notice is sufficient. Whether it is sufficient to fix such duty of inquiry upon a mere transferee it is not necessary for us to inquire, because the party liable to pay a negotiable instrument bears a relation and owes duties to the holder and loser different from those of the transferee ; though it has certainly never been decided in this Commonwealth that

such previous notice is insufficient to fix a duty of inquiry even upon a mere transferee; and the doctrine laid down in *Fales* v. *Russell* tends strongly the other way. For a party engaged in mercantile pursuits to keep a list of notes signed by himself which he has been notified have been lost or stolen, is neither impracticable nor burdensome, and is no more a hardship than any other precaution which the law merchant imposes upon those who make use of the benefits of negotiable paper, for the discouragement of fraud and the protection of the public. And the fact that an individual or a corporation does business on a very large scale is far from being a reason why such individual or corporation should be allowed to disregard any of the obligations laid upon those who issue only small amounts of negotiable paper. Ordinarily opportunities for fraud upon the public will increase with the increase of the business of a great corporation, and it is the duty of such a corporation to provide proportionally greater means of guarding against such fraud. If it be necessary to engage special clerks, or to devote extra time to applying the precautions imposed by the law merchant, it is no hardship, but only the natural and reasonable increase of a duty proportionate to the magnitude of the obligations of such a corporation. The statement of the treasurer of the defendant and of the secretary of the Union Trust Company has not shown that it was either impracticable or unreasonably difficult to provide for acting upon notice of lost or stolen securities; for any other purpose these statements are wholly incompetent, as is the circular letter of the United States treasury department, offered by the defendant.

There is another circumstance in this case which tends to fix more clearly upon the defendant the duty of inquiry, and that is that the coupon was long overdue. The maker of a coupon cannot be exempt from the liabilities which attach to all negotiable instruments when overdue. It is an elementary principle of commercial law that negotiable paper overdue carries with it, on its very face, notice of defective title sufficient to put the transferee on inquiry. *Gold* v. *Eddy*, 1 Mass. 1. *Vermilye* v. *Adams Express Co*. 21 Wall. 138. Although the application of the simple rule to payment would be practically of rare occurrence, since notice of the loss or stealing would be given in almost every

case, there is no reason why a distinction should be made in this respect between transfer and payment, and no such distinction is consistent with the language of Chief Justice Shaw in *Wheeler* v. *Guild*, before cited.   After maturity, a coupon, like any other negotiable security, loses the protection of the law merchant, and becomes a mere chose in action.   There is no presumption of law that the party presenting such a chose in action to the party liable to pay is the true holder.   The fact that the defendant has deemed it convenient to conduct its business without regard to the application of the law in this respect, does not free it from responsibility.   As was remarked by Mr. Justice Miller in *Vermilye* v. *Adams Express Co. ubi supra*, speaking of a usage to deal in government securities when overdue as if they were still current, " Bankers, brokers, and others cannot, as was attempted in this case, establish by proof a usage or custom in dealing in such paper, which, in their own interest, contravenes the established commercial law.   If they have been in the habit of disregarding that law, this does not relieve them from the consequences, nor establish a different law."

The fact that the defendant notified the plaintiff, before this suit was brought, of the name of the person to whom and of the date at which this coupon was paid, does not affect the plaintiff's right to recover in this action.   The only payment which can be a discharge to the party paying is a payment to a *bona fide* holder, whose title was acquired before maturity, for value, and without notice.   It may often happen that upon inquiry the title of the *de facto* holder will appear so plainly that the party paying will take very little risk in making the payment; but the payment of a lost negotiable instrument, after notice, overdue, and without inquiry, is a payment wholly at the payer's own risk.

We think, therefore, that judgment should be entered for the plaintiff on both counts of his declaration, upon his filing, as to the first count, a sufficient bond of indemnity.

*Judgment for the plaintiff accordingly.*