*398 OPINION.
Drake, Ch. J.,
delivered the opinion of the court:
On the 27th of October, 1878, the vault of the Manhattan Savings Institution in the city of hi ew York was burglariously entered, and an iron safe therein was broken open, and from it were stolen and carried away a large number of bonds and other securities, representing a value of about two and a half million dollars, among which were sixteen United States five-twenty coupon bonds, consols of 1865, issued under the authority of the Act of March 3,1865, u to provide toays and means for the support of the Government” (13 Stat. L., 468, ch. 77). It does not appear that the officers or servants of the institution were guilty of any negligence in the care and custody of said bonds and securities.
The Secretary of the Treasury issued nine calls for five-twenty bonds for redemption, under the authority of the Act of July 14,1870, 11 to authorize the refunding of the national debt” (16 Stat. L., 272, ch. 256); in which calls Were embraced all of said sixteen bonds. The first of the calls was dated July 30, 1878, and the last December 18, 1878, and each call matured three-months after its date. The day of the maturity of the last call was therefore March 18, 1879.
Some weeks after this last date R. Raphael & Sons, bankers in London, purchased there six of these sixteen bonds; and thereafter, in May, June, and July, 1879, purchased ten more ;. all of which they sold to the claimants L. Yon Hoffman & Co.,, then doing business as bankers in New York. The former firm bought the bonds in London, in good faith, at their full market value, without any reason to suspect any infirmity in the title to them; and the latter firm took them in equal good faith, and paid R. Raphael & Sons the full market value of them, namely, par and accrued interest, without any reason to suspect any such infirmity. The first intimation to either of those firms of the bonds having been stolen was given by the Treasury Department to L. Yon Hoffman & Go., when they sent to the Department the first lot of six of the bonds, and received therefrom information to that effect; and the same information was repeated as to the several succeeding lots, aggregating ten bonds, transmitted by them for redemption; and it was not until after *399 the information was thus given’to them that it was imparted to B. Baphael & Sons. There is, therefore, not the least ground for imputing any wrong whatever .in the transaction to either of those firms. The only question is as to the legal ownership of the bonds.
There can be no doubt that if B. Baphael & Sons or L. Yon Hoffman & Co. had purchased the bonds in good faith, for value, before the maturity of any call of the Secretary of the Treasury embracing them, they would be entitled to hold them against all the world. (Murray v. Lardner, 2 Wall., 110; Texas v. White, 7 ibid., 700; Vermilye v. Adams Express Co., 21 ibid., 138; Stinkley v. U. P. Railroad Co., 129 Mass., 52.)
The only point in the-case is as to whether their purchase after the maturity of calls by that officer changes L. Yon Hoffman & Co.’s legal rights. If those’ calls did not, in law, have the effect of making the bonds then due and payable, the Government cannot impeach or question the title of that firm, and must pay the amount of the bonds to them. If, on the other hand, the calls did have, in law, the effect of making the bonds due and payable at the maturity of the calls, then L. Yon Hoffman & Go. took overdue paper, subject to any and every defense which might be urged against their title.
The counsel for L. Yon Hoffman & Co. claim that to hold that the bonds became due and payable at the maturity of the calls is to hold that thereafter they ceased to be negotiable. We do not concur in this view, negotiable is a term applied to any contract, the right of action on which is capable of being transferred by indorsement and delivery, ór by delivery alone, and the transfer of which vests in the holder a right to sue thereon in his own name. These bonds were payable to bearer, and were therefore transferable by delivery, and therefore were, without dispute, negotiable in the legal acceptation of the word at any time before they became due and payable. Were they not equally negotiable after that time % In our opinion, it cannot be questioned that they were. We know of no rule of law which terminates the transferability of negotiable paper on the day it becomes due and payable. Beast of all is there any such rule in regard to Government bonds payable to bearer. They are just as negotiable after maturity as before; but"with different results in the two cases as 'to the legal rights of the holder. He that takes them in good faith before their maturity takes *400 them with an unimpeachable title; but the title of him who takes them after maturity may be impeached.
To avoid the necessary effect of this doctrine, the counsel of L. Yon Hoffman & Co. takes the position that the time of the maturity of these bonds is that fixed on their face for their payment by the United States, namely, the first day of July, 1885, and that until after that day they continued fully negotiable, with all the protection accorded by the law merchant to negotiable paper. And as a necessary corollary from this position he goes further, and contends that the calls of the Secretary of the Treasury for these bonds for redemption, and the non-redemption of the bonds at or after the time when they might have been presented for redemption, did not make them then overdue in the sense of being dishonored; and that unless they were overdue in that sense, L. Yon Hoffman & Co.’s title to them, acquired after the maturity of the several calls, cannot be impeached. Upon the soundness of these positions depends the right of L. Yon Hoffman & Co. to these bonds. We have considered the positions with all the respect due to the able counsel, and are not able to sustain them, for reasons now to be stated.
The fundamental error in his position is in overlooking the very terms of the bonds themselves, which make a broad line of distinction between them and ordinary commercial paper. The latter has always a time of payment fixed by its own terms, and it is dishonored only when the promisor fails to pay at that time. But on the face of these bonds the Government, while fixing a day of payment, reserves to itself the right to pay before that day; and the question here is as to the effect of that reservation. To answer this question we must look not to the law merchant, but to the statute law authorizing the issue of the bonds. They could have hpd no existence except by statutory authority; the reserved right to pay before the fixed day of payment could be stipulated for only in pursuance of statute; and to the statutes we must resort to determine the effects, direct and remote, of that reservation.
By the Act of March 3,1865, under which these bonds were issued, it was enacted as follows:
That the Secretary of the Treasury he, and he is hereby, authorized to borrow, from time to time, on the credit of the United States, * * * any sums not exceeding in the aggregate six hundred millions of dollars, *401 and to issue tlierefor bonds or treasury notes of the United States, in such form as he may prescribe; and so much thereof as may be issued in bonds f * * maybe made payable at any period, not more than forty years from date of issue, or may be made redeemable, at the pleasure of the government, at or after any period no.t less than five years nor more than forty years from date, or may be made Redeemable and payable as aforesaid, as may be expressed on their face.
This provision expresses what the contract of the United States should be with parties from, whom money should be borrowed; it formed, to every intent, a-part of every bond issued under its authority; and it was notice to all the world that the Government reserved the right, at its own pleasure, to redeem the bonds issued under its authority, at and after such time as the Secretary of the Treasury might fix for their redemption after the lapse of five years from their date.
The bonds in this case express on their face that they are payable on the first day of July, 1885; but they also express that they are u redeemable at the pleasure of the United States after the first day of July, 1870.” These terms of the contract were in exact conformity with the statute.
What is the signification of the word redeemable there? It simply expresses the right of the United States to buy and receive back the bond, by paying the full amount of it before the fixed day of payment. He who took one of those bonds took it with full notice on its face that that right existed, and also with reference on its face to the act of Congress authorizing the bond to be so shaped. By so taking it he agreed that that right might be exercised by the United States at their own pleasure, at any time after the first day of July, 1870.
What is the meaning of the words u at the pleasure of the United States ” ? Did they refer merely to the time when that pleasure might be exercised? We think not. It seems to us quite clear that the pleasure might be exercised, not only as to the time when, but also as to the place where and the terms on which the bonds might be redeemed, and the legal effect which should attend their redemption. No other view appears to us consistent with the rights of the United States, whether considered as a. contracting party or as a sovereign.
Of Course, the United States could indicate its pleasure only by an act of Congress. Notwithstanding the language of the bonds, there could be no right in any Department or officer, after the expiration of the five years, to redeem one of them *402 without express authority conferred by such an act. This conveyed notice to every holder of a bond that further legislation; must be had before the bond could be so redeemed. And it also conveyed notice to him that he took the bond subject to the pleasure of the TJnited States as to the character, scope, and effect of such legislation.
Such being the attitudes of the parties toward each other in relation to the bonds, the Congress declared the pleasure of the United States as to the exercise of the reserved right of redemption, by the following’ provision in the above-cited act of July 14,1870:
The Secretary of the Treasury is hereby authorized * * “ to pay at par and cancel any six per cent, bonds of the United States of the kind known as five-twenty bonds, which have become or shall horeaftor become redeemable by the terms of their issue. But the particular bonds so to be paid and cancelled shall in all cases be indicated and specified by class, date, and number, in the order of their numbers and issue, beginning with the first numbered and issued, in public notice to be given by the Secretary of the Treasury, and in three months after the date of such public notice the interest on the bonds so selected and advertised to be paid shall cease.
In this'provision tlie following things appear: 1. That it refers to bonds which had become, or should thereafter become, redeemable by the terms of their issue; 2. That the redemption of them should be effected by their payment at par; 3. That the payment should be made by the Secretary of the Treasury; 4. That the Secretary should give public notice, indicating and specifying by class, date, and number the particular bonds tO' be at any time redeemed; and 5. That in three months after the date of such public notice the interest on the bonds selected and advertised by the Secretary to be redeemed should cease.. Such was the form in which the United States saw fit to signify their pleasure as to the redemption of the bonds of which these sixteen were a part. That law, instantly on its passage, became,, in legal effect, a part of every bond which expressed on its face that it. was redeemable at the pleasure of the United States. Every holder of such a bond, at and after the date of that enactment, held it subject absolutely thereto, and to all legal results flowing from the operation thereof.
And now we come to the question whether a public notice— ordinarilytermed a call — given by the Secretary of the Treasury, that the principal and accrued interest of designated bdnds *403 would be paid on and after a certain day, and that the interest on such bonds would cease on that day, had the legal effect of' bringing the bonds to maturity on the specified day of payment ? If it did have that effect, then L. Yon Hoffman & Co. bought— not dishonored, but — overdue bonds, which remained in the market, not because the Government had failed to pay them,, but because the holders had failed to present them for payment-at the time named by the Government for their presentation for that purpose. L. Yon Hoffman & Co. contend that these bonds were not brought to maturity by those calls, but could be considered as matured only on the first day of July, 1885 5 and that therefore they took a title not subject to be impeached.
In considering this position the first point to be settled is the meaning of the maturity of a negotiable instrument. There can be but one answer to this — that the time of maturity is the time when the instrument becomes due and payable; that is, when the holder of it is entitled to demand, and the maker of it is bound to pay, all that is due upon it.
Ordinarily, the time of maturity is fixed .by the terms of the instrument, and in such case neither party to it can, by his own separate act, change the time./ The holder cannot demand payment before the fixed day, nor can the maker compel the holder to receive payment before that day. This is so because the contract is to be enforced and fulfilled in strict accordance with its terms. Had these bonds been ’ simply payable on the first day of July, 1885, the Hnited States could not have required the holder of them, under penalty of the stoppage of interest, to receive payment before that day, and therefore they could never before then have been brought to maturity.
But that is not this case. The^bonds -in question, we repeat, bore on their face the declaration of the right of the United States to redeem them after the first day of July, 1870, and that right was reserved to the United States by the act under which the bonds were issued, and was, in every view, of the very essence of the contract. The subsequent act of July 14,1870, prescribed how that right should be exercised.
Now, when that right was exercised in conformity with that act, we are unable to perceive-why it did. not bring these bonds to maturity, each oue'at the end of three months after the date of the call embracing it, when the holder of it would be entitled to receive the principal of it and accrued interest. *404 Tills is ho more nor less than just what he would be entitled to on any day of payment fixed in the bond. To contend, therefore, that the bond did not mature on the day specified in the Secretary’s notice for its full payment seems to us to be wholly without justification. We therefore hold that each ofthe bonds in question did, in law, become matured on the day when the holder of it had the right, in pursuance of the Secretary’s call,1 to receive payment of all then due on it; and that whoever bought them after’that day took them as overdue paper, with only such title as his vendor had, and liable to have his title to them disputed and impeached..
There is in this ruling no hardship on L. Yon which they did not knowingly bring upon themselves. They knew that these were “called bonds,” and they bought them as such. . If, when they bought them, they believed that they had not matured, and would not mature until the first day of July, 1885, why should they have transmitted them, as they did instantly, to the Treasury Department for redemption1? They bought them at par and accrued interest, at a time when it was a notorious public fact, of which we are entitled to take judicial notice, that in every money market in the world where United States bonds were bought and sold, these bonds, if payable only in 1885, would have commanded a considerable premium. Why did they not, by a sale of them, realize the profit of the premium ? The answer is very simple and inevitable. They knew that the bonds were due and payable; that they had, in eyes of all dealers in such securities, reached their maturity; that they had no market value, except as representing the right to receive the principal of them and accrued interest; and they lost no time in seeking to obtain from the Treasury just that amount, and asked no more.
From all this it follows, as it seems to us, that L. Yon man & Co. acquired, as against the Manhattan Savings Institution, no title to these stolen bonds, and that the' institution has still the title to them, wholly unimpaired by the fact of their having been stolen.
At the argument much was said on both sides the alterations of the numbers of five of the bonds. We have not noticed that subject because, as between these contending claimants, the alterations have no bearing on the question of title. If the bonds were annulled by the alterations, then *405 neither claimanlis entitled to recover on them. Neither,"therefore, can attempt to overthrow the other’s right of recovery, because of the alterations, without thereby overthrowing his own right. It is only the Government that could set up the alterations as a defense, and it has not done so. On the contrary, it stands ready to pay the altered bonds whenever the rightful ownership of them is judicially determined; and it is to obtain such determination that the whole controversy was remitted to this court by the Secretary of the Treasury.
Note. — On the 4th of June, 1883, a similar case was decided in favor of the Manhattan Savings Institution, in which Messrs. J. S. Morgan Sb Co. were "also claimants as purchaser of the bonds sued on. Judgment was rendered for the bank in the sum of $15,284.53.
The decision of the court is, that the petition of L. Yon Hoffman & Co. be dismissed; and that judgment be entered in favor of the Manhattan Savings Institution for the principal of the sixteen bonds, $13,000, and for the aggregated interest, accrued on them up to the maturity of the several calls made by the Secretary of the Treasury, as shown in the tabulated statement in finding Y, amounting together to $13,229.28.