## VERMILYE & CO. v. ADAMS EXPRESS COMPANY.

1. The bonds and treasury notes of the United States payable to holder or bearer at a definite future time are negotiable commercial paper, and their transferability is subject to the commercial law of other paper of that character.

2. Where such paper is overdue a purchaser takes subject to the rights of

antecedent holders to the same extent as in other paper bought after its maturity.

3. No usage or custom among bankers and brokers dealing in such paper can be proved in contravention of this rule of law. They cannot in their own interest by violations of the law change it.

4. It is their duty when served with notice of the loss of such paper by the rightful owner after maturity to make memoranda or lists, or adopt some other reasonable mode of reference, where the notice identifies the paper, to enable them to recall the service of notice.

5. Hence treasury notes of the United States stolen from an express company and sold for value after due in the regular course of business may be recovered of the purchaser by the express company, which had succeeded to the right of the original owner.

APPEAL from the Circuit Court for the Southern District of New York; the case being thus:

Vermilye & Co., bankers of New York, having presented to the Treasury of the United States for payment some time after their maturity eight treasury notes issued under the authority of the act of March 5th, 1865, were informed that the Adams Express Company asserted an ownership of the notes, and that they could not be paid until the question of the rightful ownership was settled.

The matter resulted in a bill of interpleader, filed by the United States in the Circuit Court for the Southern District of New York, against both the express company and Vermilye & Co., to which they filed their respective answers, the notes being deposited with the clerk of the court to abide the event of the suit.

The notes in controversy, to wit, five of $1000 each, and three of $100 each, came to the possession of the express company to be forwarded for conversion into bonds of the United States, and were started on their way from Louisville in custody of their messenger on the 22d of May, 1868. Shortly after leaving Louisville the car on which were the messenger and the notes, was stopped and entered by robbers, who, after knocking the messenger down, and leaving him for dead, carried off the safe containing these notes, which was found the next day broken open and without the notes in it. The express company, as soon as it could ob-

tain the numbers and other description of the stolen notes, advertised extensively the loss in the newspapers, gave notice at the Treasury Department, and entered there a caveat against their payment or conversion into bonds to any one else, and gave notice to the principal bankers and brokers of the city of New York of the loss and their claim on the notes. On the 29th of May and the 5th of June, respectively, the express company delivered notices to persons behind the counter of Vermilye & Co., at their place of business, which notice sufficiently described the lost notes, cautioned all persons from receiving or negotiating them, and asserted the claim of the express company to the notes. The company paid the owner of the notes, who had delivered them to the company for transportation, and appeared to have done all that could be done to assert their rights in the premises.

On the 9th and 12th days of April, 1869, Vermilye & Co. purchased these notes over their counter, at fair prices, in the regular course of business, and forwarded them to the Treasury Department for redemption, where they were met by the caveat of the express company.

As already stated, these notes were issued under the act of March 3d, 1865.* That statute authorized the Secretary of the Treasury to borrow on the credit of the United States any sums of money not exceeding six hundred millions of dollars, for which he should issue bonds or treasury notes in such form as he might prescribe. It also authorized him to make the notes convertible into bonds, and payable or redeemable at such periods as he might think best. Under this statute the notes in controversy were issued, payable to the holder three years after date, and dated July 15th, 1865, bearing interest payable semi-annually, for which coupons were attached, except for the interest of the last six months. That was to be paid with the principal when the notes were presented. On the back of the note was a statement, thus:

"At maturity, convertible at the option of the holder into

---

* 13 Stat. at Large, 468.

bonds, redeemable at the pleasure of the government, at any time after five years, and payable twenty years from June 15th, 1868, with interest at six per cent. per annum, payable semi-annually, in coin."

At the time of the purchase of the notes by Vermilye & Co. more than three years had elapsed from the date of their issue, and the Secretary of the Treasury had given notice that the notes would be paid or converted into bonds at the option of the holder on presentation to the department, and that they had ceased to bear interest.

On the hearing, Vermilye & Co. brought several witnesses, bankers and brokers, to show that notes of the sort here under consideration continued to be bought and sold after they had become due and interest had ceased thereon; that it was not customary for dealers in government securities to keep records or lists of the numbers or description of bonds alleged to have been lost, stolen, or altered, or to refer to such lists before purchasing such securities; that, in their judgment, it would be impracticable to carry on the business of dealing in government securities, if it were necessary to resort to such lists and make such examination previous to purchase; and that the purchase of the notes in controversy by Vermilye & Co. was made in the ordinary and usual mode in which such transactions are conducted.

Some testimony was given on the part of the express company to show an indorsement by the owner on certain of the notes, existing when they were stolen—"Pay to the order of the Secretary of the Treasury for *conversion;*" but this indorsement, if then existing, was not now visible on ordinary inspection. And on their face the notes remained payable " to bearer."

The court below held—

1st. That there was nothing in the evidence about indorsement, which could restrict the negotiability.

2d. That the notes were on their face overdue, and that the ordinary rule applicable to such notes—viz., that the person taking them took them with all the infirmities belonging to them—applied, though the notes were securities issued

by the United States; this point being, as the court considered, settled in *Texas* v. *White*\* and *Texas* v. *Hardenberg*.†

3d. That a sufficient title to sue existed in the express company.

Decree being accordingly given for the express company, Vermilye & Co. took this appeal.

*Mr. J. E. Burrill, for the appellant,* contended, among other things—

1st. That the evidence showed that the particular class of securities under consideration, obligations of the government, did not lose their negotiability when they had matured, but that they were bought and sold, dealt in, and circulated in the market afterwards as before; that accordingly the reason of the rule ordinarily applicable—that " a person who takes a bill which *appears on its face to be dishonored,* takes it with all the infirmities belonging to it "—ceased to exist; that there was no such evidence about the rule governing the market as to this class of securities introduced into the cases of *Texas* v. *White* and in *Texas* v. *Hardenberg,* relied on by the court below, and that the ruling of the court below on this point was therefore wrong.

2d. That these notes were not past due in the sense in which that term is used to express a *dishonored* note—a note which had been presented and had not been paid, and was the evidence of a broken promise; that by the law under which the notes were issued, and by the indorsement on the notes, they were, after the expiration of three years, either payable in currency or convertible into five-twenty bonds, bearing interest at six per cent. per annum, from and after July 15th, 1868; that when the three years had expired, these bonds had not matured as notes would have done, because the holder had the option to take his money or to convert it into a bond; that the option was not the option of the government, but the option of the holder, and that he was not obliged to exercise his option at

---

\* 7 Wallace, 735.                           † 10 Id. 90.

the very moment the note matured; that the contract was not determined because the holder had not exercised his option; that while it was true, that if the holders, in the exercise of the option, chose to demand a redemption of the note in money, the note ceased to draw interest after its maturity, yet that this would be merely because the debtor was ready to pay when due, and stood in the position of having tendered the money. But that the man who chose to convert the note into a bond did not lose his interest, nor indeed lose anything by the delay in presenting his note for conversion; that he was still entitled to convert into a bond, payable twenty years from July 15th, 1868, with interest from that time; that whenever he chose to call for his bond he was entitled to have it, and to have it as he would have been entitled to have it on the day mentioned in the note. His bond, if asked for conversion, was therefore to be dated July 15th, 1868, which was the maturity of the note, and the interest was to run from that time and to be paid semi-annually therefor.

3d. That the case failed to show any right or title of the express company to the notes; since (1st) the company did not allege any assignment to it of the notes, or of the moneys due thereon, or of any interest therein; and since (2d) it did not place its right to the notes upon the fact that it was a trustee of them and had a special property in them, but upon the fact that it had paid the owners of the notes the amount of them, in discharge of its liability as carrier; thus *assuming*, wrongly, that the notes were negotiable and so passed to the company.

*Messrs. Clarence A. Seward and T. P. Chapman, contra.*

Mr. Justice MILLER delivered the opinion of the court.

1. The first thing which presents itself on the facts of this case is to determine the character of the notes as it affects the law of their transferability at the time they were purchased by the appellants; for notwithstanding some testimony about the erasure of an indorsement on some of the notes, we are

of opinion that it was so skilfully done as not to attract attention with the usual care in examining such notes given by bankers.

They had the ordinary form of negotiable instruments, payable at a definite time, and that time had passed and they were unpaid. This was obvious on the face of the paper. The fact that the holder had an option to convert them into other bonds does not change their character.

That this option was to be exercised by the holder, and not by the United States, is all that saves them from losing their character as negotiable paper, for if they had been absolutely payable in other bonds, or in bonds or money at the option of the maker, they would not, according to all the authorities, be promissory notes, and they can lay claim to no other form of negotiable instrument. As it is they were negotiable promissory notes nine months overdue when purchased by the appellants. They were not legal tenders, made to circulate as money, which must, from the nature of the functions they are to perform, remain free from the liability attaching to ordinary promises to pay after maturity. Nor were they bonds of the class which, having long time to run, payable to holder, have become by the necessities of modern usage negotiable paper, with all the protection that belongs to that class of obligations. These were simply notes, negotiable it is true, having when issued three years to run, which three years had long expired, and the notes were due and unpaid.

We cannot agree with counsel for the appellants that the simple fact that they were the obligations of the government takes them out of the rule which subjects the purchaser of overdue paper to an inquiry into the circumstances under which it was made, as regards the rights of antecedent holders. The government pays its obligations according to their terms with far more punctuality than the average class of business men. The very fact that when one of its notes is due the money can certainly be had for it, if payable in money, should be a warning to the purchaser of such an obligation after its maturity to look to the source from which

it comes, and to be cautious in paying his money for it. In the case of *Texas* v. *White*,* the bonds of the government issued to the State of Texas were dated July 1st, 1851, and *were redeemable* after the 31st day of December, 1864. This court held that after that date they were to be considered as overdue paper, in regard to their negotiability, observing that in strictness, it is true, they were not payable on the day when they became redeemable, but the known usage of the United States to pay all bonds as soon as the right of payment accrues, except when a distinction between redeemability and payability is made by law and shown on the face of the bonds, requires the application of the rule respecting overdue obligations to bonds of the United States which have become redeemable, and in respect to which no such distinction is made.

Mr. Justice Grier was the only member of the court who dissented from the proposition, and he based it on the ground that the government had exercised its option of continuing to pay interest instead of redeeming the bonds.

We have not quoted the language from the opinion in that case with any view of affirming it. It may admit of grave doubt whether such bonds, redeemable but not payable at a certain day, except at the option of the government, do become overdue in the sense of being dishonored if not paid or redeemed on that day.

But the notes in the case before us have no such feature. They are absolutely payable at a certain time, and we think the case is authority for holding that such an obligation overdue ceases to be negotiable in the sense which frees the transaction from all inquiry into the rights of antecedent holders. This ground is sufficient, of itself, to justify the decree in favor of the express company.

2. When these notes were offered to the appellants for sale they carried upon their face the fact that the period for their payment or conversion into bonds had come nine months before; that for that time they had ceased to bear

---

* 7 Wallace, 700.

interest; and this would very naturally suggest the inquiry which the law of negotiable paper implies, as to the reason why they had not been paid or converted into bonds.

Bankers, brokers, and others cannot, as was attempted in this case, establish by proof a usage or custom in dealing in such paper, which, in their own interest, contravenes the established commercial law. If they have been in the habit of disregarding that law, this does not relieve them from the consequences nor establish a different law. Nor sitting here as chancellors can we say that the testimony offered of the impossibility of men in that business bearing in mind the notices of loss or theft of bonds or notes well described, with which they have been served, satisfies us of the soundness of the proposition. By the well-settled law of the case they may purchase such paper before due without cumbering their minds or their offices with the memoranda of such notices. But we apprehend that the amount of overdue paper presented for negotiation is not so large as that bankers receiving notice of loss cannot make or keep a book or other form of reference which will enable them with a very little trouble to ascertain when overdue paper is presented whether they have been served with notice of a claim adverse to the party presenting it.

The fact that the notes were at once recognized at the treasury by reason of the notices served there, proves that no unreasonable amount of care and prudence was necessary to enable bankers and brokers to do the same.

There are other rights in cases of overdue paper besides the right to purchase it, which require that care should be exercised, especially by parties who have fair notice of these rights.

Bankers and brokers cannot, more than others, when warned of possible or probable danger in their business, shut their eyes and plead a want of knowledge which is wilful. In this matter also the appellants were in fault.

We attach no importance to the denial of the title of the express company. Either as bailees or as equitable owners of

the notes for which they had paid the parties who intrusted them to their custody, they are entitled to recover them, and the decree of the Circuit Court to that effect is

AFFIRMED.