## No. 11,014.

### Jos. L. Herwig vs. Richardson & May.

The doctrine announced in Pugh vs. Moore, Hyams & Co., 44 An. 209, affirmed.

APPEAL from the Civil District Court for the Parish of Orleans. King, J.

W. H. Rogers and Spencer & Fenner for Plaintiff and Appellee.

Bayne & Denègre for Defendants and Appellants.

The opinion of the court was delivered by

McEnery, J. The plaintiff alleges that he bought from the defendants, May 29, 1888, ten bonds of the State of Louisiana known as consolidated bonds of the State, each bond being for the sum of $1000, bearing 4 per cent. interest; that said purchase was made through the firm of Seixas & Brown, brokers, acting for and representing the defendants; that said bonds are worthless, as they are of a number of 196 bonds issued under Act 3 of 1874 in favor of the Agricultural and Mechanical College of this State to be held in trust for said college by the treasurer of the State, but which were afterward declared null and void by Art. 223 of the State Constitution,

which ordered through the Legislature the destruction of said bonds; that these bonds were stolen from the State treasury by the treasurer, E. A. Burke, and negotiated by him.   The prayer of the petition is for the delivery to plaintiff of valid bonds of the State, such as he intended to purchase, and in default of such delivery that the defendants be ordered to pay him the sum of $9112.50, with 4 per cent. interest from May 29, 1888.   By an amended petition the prayer is altered, demanding 5 per cent. interest on the moneyed judgment asked for in the alternative.

The defendants in answering say that they sold, through Seixas & Brown, stock brokers, on the 28th day of May, 1888, 50,000 4 per cent. consolidated bonds, and delivered said bonds to said brokers on the 29th day of May, 1888, and have no knowledge of the names of the purchasers of said bonds, and they deny that they ever sold any worthless bonds.

Of the 50,000 sold they have heard of no complaint, except from the plaintiff in the beginning of the year 1891; that the bonds sold by defendants through Seixas & Brown were negotiable bonds of the State of Louisiana which passed current in the market, and were received and delivered at the Stock Exchange in this city (New Orleans), and to and by all persons, and were unquestioned; that defendants had no knowledge or suspicion that any of the bonds of the State of Louisiana were of doubtful validity, and neither defendants nor any one else even had a suspicion against the validity of said bonds until late in the season of 1888; that they were bona fide holders of said bonds before maturity of all the bonds delivered by them to Seixas & Brown; all of said bonds bore date in 1874, were payable in 1914, and were purchased in open market and for a valuable consideration, and defendants are not liable in any manner and under any circumstances to the plaintiff.

That said bonds were issued by the State in 1874, and were by her put in circulation, and under the commercial law, adopted and prevailing throughout the United States and this State, there is no liability on their part to plaintiff, even if defendants had sold him the bonds as alleged in his petition; that said bonds pass daily from hand to hand without other warranty than the genuineness of the signatures to them; that as bona fide holders of said bonds for value received before maturity defendants' rights can not be impaired without violating the Constitution and laws of the United States.

There was judgment for the plaintiff and the defendants appealed.

The record establishes by conclusive proof that the bonds described in plaintiff's petition and offered in evidence were purchased by the plaintiff from Richardson & May. The bonds were originally consolidated bonds of the State of Louisiana and belonged to the Agricultural and Mechanical College fund, and were held by the State' and were deposited in the treasurer's office for the use of said fund.

In the Constitution of the State, adopted in 1879, the entire debt of the State due said college was assumed by the State as a perpetual loan, which was placed to the credit of said fund, upon which 5 per cent. interest is to be perpetually paid. The consolidated bonds of the State held by the State for the use of said fund were declared to be null and void after the 1st day of January, 1880, and the State was prohibited forever from making any provision for their payment and they were ordered to be destroyed. Constitution, Art. 223.

Those bonds were not destroyed, but remained in the office of the treasurer until some time after the 1st day of January, 1880, when they were by him taken from the treasurer's office and disposed of.

The bonds purchased by plaintiff were a part of those stolen from the treasurer's office.

The issues in this case are identical in every respect, except as to the identity of the bonds purchased from defendants with those presented and decided in the case of Pugh vs. Moore, Hyams & Co., 44 An. We have not been convinced that there was error in the decree in that case.

We are asked by defendants to postpone our decree in this case until the final disposition of a case involving similar issues now pending in the Supreme Court of the United States; otherwise, should the decree of the United States Supreme Court be contrary to this, "the fate of the holder of these bonds will be a matter depending upon the accident of citizenship, not upon principles of law."

In declining to postpone our decree herein, we adopt as the reasons therefor the following part of the concurring opinion of Mr. Justice Fenner in the case of Pugh vs. Moore, Hyams & Co.:

"It is within the power of the State to destroy the negotiability of all paper and to withdraw from commerce such things as it may deem proper.

"Sun Mutual Insurance Company vs. Board of Liquidation, 31 An. 175; State vs. Board, 29 An. 77. These decisions are, for us, the

highest of all judicial authority as to the subject matter of which they treat; higher even than that of the Supreme Court of the United States, unless it can be shown that they involve some federal question, on which we acknowledge the paramount authority of that high tribunal. We can discover no federal question in those cases or in this. Nobody would seriously question the power of the State to modify, repeal or abrogate the law merchant, except, at least, in so far as such action might impair contract rights existing at the date of such legislation; and, inasmuch as the rights here involved necessarily arose after the date of the legislation and after the facts which gave effect thereto, this possible exception can not apply."

Defendants complained of the rate of interest allowed in the judgment for the amount ordered to be paid by defendants if they do not deliver the bonds.

The amount due plaintiff is a debt owing by the defendants if they fail to carry out the original contract and deliver to plaintiff valid consolidated bonds of the State. The judgment is, therefore, correct in allowing 5 per cent. interest. Revised Statutes, 1883.

Judgment affirmed.

## DISSENTING OPINION.

WATKINS, J. This is, in every respect, a parallel case to Pugh vs. Moore, Hyams & Co., recently decided, and I adhere to the views expressed in my dissent therein.

This is a suit by a purchaser of several bonds, known as Agricultural and Mechanical College bonds, forming part of the consolidated bonds of the State of Louisiana, which were declared, by Art. 233 of the Constitution of 1879, to be null and void after the 1st of January, 1880; and which were by him purchased of the defendants, in May, 1888, as valid, without any knowledge of same being void, and on that account he demands of them the restitution of the purchase price.

In my opinion it is indisputably well settled that all persons who deal in commercial paper, negotiable obligations of every kind, are, pro hac vice, bound by the provisions of the law merchant—the precepts of the Civil Code in relation to " the assignment or transfer of credits and other incorporeal rights" having no application thereto.

The bonds declared upon are genuine consolidated bonds of the State of Louisiana, properly signed by the officers designated in the funding act of 1874; and same were, on the 30th of November, 1874,

issued by the Board of .Liquidation, in exchange for Agricultural and Mechanical College bonds, which were of undoubted validity primarily.

These bonds were drawn payable to bearer at forty years from the 1st of January, 1874, regularly numbered, and bearing interest at the rate of 7 per cent., payable semi-annually, evidenced by interest coupons annexed thereto, and duly signed by the Treasurer and Auditor.

Apparently, and from a physical examination of them, they are clean and free from blemish, and are invested with the fullest, possible sanction that could be given to any paper a State *could* issue and put upon the markets of the world.

In the same year in which the funding law was enacted there was a constitutional amendment proposed which declared that the consolidated bonds, thus authorized and issued, created a valid contract between the State and ¦each and every holder of said bonds, and which the State should by no means impair.

This amendment was adopted and became a part of the organic law prior to the date of the issuance of said consolidated bonds, and so remained until the adoption of the Constitution of 1879.

Manifestly, it was upon faith of these laws, statutory and constitutional, that the public creditors of the State—the Agricultural and Mechanical College among the number—accepted such consolidated bonds and gave in exchange other valid obligations therefor.

I take it to be a settled principle of law that the government of a State, like that of the United States, when she makes herself a party to negotiable paper, incurs all the risks and responsibilities of an individual maker or indorser of such paper, under like circumstances; and in the hands of a *bona fide* holder for value, before maturity, the validity of such paper can no more be questioned than similar paper of an individual maker or indorser could be.

That when a State borrows money or contracts a debt, and therefor issues her promise to pay at some future time, in the form of a bill of exchange or promissory note, in pursuance of statutory provision and constitutional behest, she does not act as sovereign but descends to the level of ordinary individuals, and the same meaning is to be given such contract as is ordinarily given to contracts between private persons.

" Hence," as the Supreme Court had occasion to say, " instead of

there being, in the undertaking of a State or city to pay a *reservation of a sovereign right to withold payment, the contract should be regarded as an assurance that such a right will not be exercised.*" . 21 Wall. 138.

As was appropriately and justly observed by the Supreme Court in Louisiana vs. Jumel, the terms of the consolidated bonds " show unmistakably a design to make (them) so far contracts that their obligation would be protected by the Constitution of the United States against impairment." 107 U. S. 711.

In view of these established precepts of law, in reference to State obligations of the kind described, that is to say, that in the execution and issuance of negotiable instruments a State does not act in her capacity of sovereign, but as an individual, and is to be dealt with accordingly—a *bona fide* purchaser for value gets just as good a title as he would obtain to the commercial paper of an ordinary individual, under like circumstances, and would acquire a right to the same remedies and safeguards for the protection of his title as he would in case of his acquisition of private paper.

The sole foundation of plaintiff's demand is that the bonds in question were rendered absolutely null and void by the constitutional article from and after the 1st of January, 1880, and not that their *execution* and *issuance* was the result of any fraudulent or illegal acts of any State officer or agent, who, under the Constitution and the law, was entrusted with their execution and issuance.

For it is conceded that the bonds were primarily valid when issued in 1874 in exchange for other valid bonds, and it is specifically averred that they only ceased to be valid and became void through constitutional instrumentality *after* the 1st of January, 1880.

On this hypothesis it seems perfectly obvious that if this court were dealing with obligations of an individual maker or indorser, there could be no question of the duty being imposed upon plaintiff to show by a fair preponderance of proof that they were *not* extant in the hands of a *bona fide* third possessor at the time their nullity was promulgated; and that failing to administer such evidence he could take no judgment against a party from whom he had obtained them for restitution of the price paid.

And it being a settled principle that in such case a State occupies the same contract relation toward her creditors as an individual does toward his creditors; identically the same test must be applied to one as to the other.

Applying this principle to the case under consideration, and what is the result? In my opinion the proof in the record is insufficient to exonerate the State from responsibility on the bonds under consideration, and plaintiff's right to relief depends upon that fact being established.

At the time of plaintiff's acquisition of said bonds—May, 1888— there had been no separation or segregation of the so-called Agricultural and Mechanical College bonds from the general series of $12,000,000 of State consolidated bonds above described. At that time there was no official record, *data*, or information of any kind, extant or available to the defendants, whereby they could have known or been made aware of their possible invalidity. There is not now, nor has there ever been, any thing *apparent from simple inspection of the bonds* in controversy whereby they could be identified as Agricultural and Mechanical College bonds, and segregated from consolidated bonds by purchasers in open market. Having been issued by the Board of Liquidation in 1874, and given the form of all other consolidated bonds—as the funding act required—there was *nothing* to hinder their free circulation or restrain their negotiability.

Notwithstanding the constitutional declaration that " the consolidated bonds of the State *now held* by the State for the use of said fund shall be null and void after the 1st of January, 1880," and its further requirement that they " *shall be destroyed,* in such manner as the General Assembly shall direct," the $196,000 of Agricultural and Mechanical College bonds were never separated from the mass of consolidated bonds for destruction by the General Assembly, or destroyed so far as the proof has disclosed.

From this fact one of two propositions is clearly established, (1) that the bonds in question were *not in possession of the State on the 1st of January, 1880,* and were on that account unaffected by the constitutional fiat; (2) or if they were, the State, through her General Assembly, was at fault in not causing them to be destroyed and placed beyond the reach of the thief and embezzler, and failing to cause them to be destroyed she would be estopped from urging the consequences of her fault to the detriment and injury of honest people dealing in such securities, particularly in view of the fact that her fiscal agents were paying interest coupons up to the date of defendant's sale of the bonds to the plaintiff, thus giving them faith and currency.

That the *identity* of what are called Agricultural and Mechanical College bonds was not ascertained prior to 1888 is a well established fact—even so far as the State treasurer and auditor are concerned. For, on the 11th of March, 1889, the treasurer's official statement of the bonded debt of the State, made to the secretary of the New York Stock Exchange, omits mention of the reprobated bonds; but in his subsequent report, made under date September 29, 1889, the information was, for the first time, vouchsafed to that body that certain consolidated bonds had been declared null and void by the terms of Art. 233 of the Constitution of 1879, and that they were numbered respectively and consecutively from 710 to 905, and were of the denomination of one thousand dollars each.

Subsequently to the date last given, an investigation was set on foot by the auditor and treasurer, which disclosed the fact that a large number of reprobated bonds were in circulation.

Replying to an interrogatory propounded by the New York Stock Exchange, as to "the days and dates" when the information previously communicated designating the numbers of the fraudulent bonds was first promulgated, the treasurer stated, in a letter of the 29th of October, 1889, that it was promulgated on the 29th ultimo.

It is true that in 1879 there was a report made by the treasurer, which contains a statement of $196,200 Agricultural and Mechanical College bonds and their numbers; but that report was made antecedent to the adoption of the Constitution of 1879, and erroneously makes reference to the act under authority of which they were issued as Act No. 3 of 1879 instead of 1874. And the Constitution itself speaks of these bonds in general terms as " the *consolidated* bonds of the State *now held* by the State for the use of said fund "—meaning the Agricultural and Mechanical College fund—and designates their amount to be $182,313.32, instead of $196,200.

Just here the question arises as the efficacy and sufficiency of the notice which said report and constitutional article convey. They certainly conveyed none to the auditor and treasurer of succeeding years, as their official report shows. If they did, why did the State's fiscal agent continue the payment of interest coupons on *all* consolidated bonds alike, until the year 1889, subsequent to the plaintiff's acquisition of the bonds from the defendants? If notice was thereby conveyed, such a course of dealing was most inexcusable. But if notice was not thereby conveyed to officers of State who had posses-

sion of the public records, who were the successors in office of those whose dereliction of duty caused the issuance of the illegal bonds, and who are perfectly familiar with all the official data on which this complaint is founded, as far as that information goes—by how much the less was notice conveyed to the general public thereby.

Not only is it conclusively proven by the official reports of the present auditor and treasurer and their sworn evidence that notice was not conveyed, but it is even better established by the general course of the markets here and elsewhere, and by the prices paid for the bonds.

It seems to my mind to be a perfectly clear proposition of law that, in dealing with her own promises to pay, the State is placed under exactly the same obligation of duty toward persons holding them as an individual debtor would be toward his creditor; and that, forsooth, she *is* a sovereign does not entitle her to *arbitrarily* repudiate her obligations.

I take it to be settled by the weight of authority that the *fraud* which shifts the burden of proof of *bona fide* title upon the holder must be in the original consideration or representations used in obtaining the *execution* of the instrument, and not in the *after breach of trust, in diverting it from the uses for which it was intended;* because the possession of a negotiable instrument before maturity carries with it a title that is fully protected against charge of fraud or theft, or *failure* of consideration, as between antecedent parties; and this rule of property is so strong that such a holder can convey to another a valid and indefeasible title, notwithstanding the latter knew of its inherent defects.

In view of the foregoing precepts of law, I do not think the bonds of the State, in the hands of such a holder, can be held absolutely void.

Conceding the largest latitude and liberty of action to the State, acting through the mediation of a constitutional convention in respect to the creation of commercial paper, and restricting its negotiability while in her possession or under the control and custody of her authorized officers, yet I can not conceive of any reason, and am unaware of any legal principle, on which she can be recognized to have the power to thus control and restrain it in the hands of a *bona fide* holder.

For, let it not be forgotten that the constitutional amendment of

1874, which authorized and sanctioned the issuance of consolidated bonds, in terms declares that they shall be " a valid contract between the State and every holder," and " *which the State shall by no means impair;*" and that the Supreme Court, in treating of these bonds, declared that " the language employed in this instance shows unmistakably a design to make these promises and these pledges so far contracts that their obligation would be protected by the Constitution from impairment." 107 U. S. 711.

The court evidently considered that the constitutional precept quoted was read into the contract as a governing principle, and such being the case the bonds were in the hands of innocent purchasers, entirely beyond the reach of statutory or constitutional impairment.

In dealing with the power of a State to recall bonds once issued, and of her power to withhold payment, the Supreme Court said, on the contrary, that her " *contract should be regarded as an assurance that such a right will not be exercised.*" 96 U. S. 432.

The theory upon which the opinion of the majority of the court in Pugh vs. Moore proceeds is analyzed in the opinion refusing a rehearing, and the purport of it is that the law merchant is not applicable to cases arising in the State of Louisiana, except in so far as it does not conflict with the statute law of the State or some constitutional provision; and that the State has full and plenary power of modifying or amending it at will. That the constitutional provisions herein cited were intended to repeal and abrogate the law merchant in so far as it applies to the bonds in question. That the rights asserted by the defendants arose subsequent to its adoption, and must be governed by it and not the law merchant. That in this manner the bonds in controversy lost their quality of negotiability, and became assignable as choses in action only. That the courts of this State are bound to apply these principles of law and enforce the mandates of the Constitution.

I will at once concede the correctness of each of the foregoing propositions, and yet the serious question is not disposed of, and that is the right of a purchaser, in good faith, of bonds of the character referred to, which were in circulation at the time of the promulgation of the constitutional fiat, depriving them of the incidents of negotiability under the law merchant. For it has been demonstrated beyond peradventure of a doubt that these bonds were originally issued for a valid consideration, and were thereafter continuously

circulated as valid obligations of the State until the year 1888, when plaintiff bought of the defendants.

That the rights of the defendants arose *subsequent* to the adoption of the Constitution makes no difference; first, because there was nothing appearing on the face of the bonds, or upon the records in the offices of the auditor and treasurer, to put them on their guard by identifying the fraudulent bonds; second, because the good faith of the first taker of a piece of commercial paper passes to subsequent purchasers.

In so far as the cases of The Sun Mutual Insurance Company vs. Board of Liquidation, 31 An. 175, and State ex rel. Durant vs. Board, 29 An. 77, are concerned, it is indisputable that they, and other similar cases cited on the same side, only apply to *bonds, warrants and other obligations of the State which were not yet funded into consolidated bonds, but which the Board of Liquidation has declined and refused to fund into consolidated bonds.*

It was to State creditors holding such State obligations, and seeking to compel the Board of Liquidation to fund them into consolidated bonds, that the court said in those cases: You have submitted yourselves to the operation of the funding laws, demanding the right to surrender obligations of the State in exchange for consolidated bonds, and must be conclusively presumed to have accepted the grace of those statutes upon the terms they have extended, coupled with the right of the State to question the validity of the obligations tendered for exchange. These statutes have merely given permission to you to sue the State under the conditions imposed, and it is only through the channel thus pointed out that you can reach the courts. It is made a condition precedent to the maintenance of such an action that you shall establish the good consideration and valid issue of the obligations you offer to surrender. It is to this law, and not to the law merchant, that you must look as a guide.

But it is evident to my mind thatthose decisions have no possible applicability to the present controversy, because we are dealing with *consolidated bonds* that were issued on the 30th of November, 1874, prior to the enactment of the supplemental funding act of 1875, under the provisions of which the Sun Mutual Insurance Company and Durant cases were brought and decided.

The bonds in suit were issued in exchange for previously existing

and unquestionably valid bonds of the State, and without question or suit. They were put into circulation as all other consolidated bonds were, and without anything to indicate. that they were not commercial instruments. Nothing happened until the adoption of the Constitution of 1879—six years after their execution and issuance conformably to the funding act of 1874 and the constitutional amendment of 1874—to indicate impairment of their credit.

Confronted with this situation, I feel constrained to express my dissent from the proposition *that the State can change the status of her obligations whilst they are in the hands of innocent third holders for value and before maturity.*