ÆTNA INSURANCE COMPANY, Glens Falls Insurance Company, Home Insurance Company, Institute of London Underwriters, Mutual Fire Marine & Inland Insurance Company, Pearl Assurance Company, Limited, Sun Insurance Office, Limited, The Pennsylvania Railroad Company

v.

UNITED STATES.

No. 281-52.

United States Court of Claims.

March 5, 1958.

Whitaker, J., dissented.

Raymond E. Stefferson and Richard T. Graham, New York City, for plaintiffs Aetna Ins. Co. and others. Paul F. McArdle, Washington, D. C., was on the briefs, for plaintiff Pennsylvania Railway Co.

Benjamin H. Pester, Washington, D. C., with whom was Charles K. Rice, Asst. Atty. Gen., for defendant. James P. Garland, Washington, D. C., was on the briefs.

REED, Justice (Retired), sitting by designation.

This is a suit for a refund of tax paid on industrial alcohol lost as a result of a rail accident during shipment from a bonded warehouse. The plaintiffs are the Aetna Insurance Company and associated insurance companies, and The Pennsylvania Railroad Company. The

facts upon which the claim for refund is founded are as follows:

On July 21, 1949, Midwest Solvents Company, Inc., hereinafter referred to as Midwest, a manufacturer of alcohol, withdrew from its Industrial Alcohol Bonded Warehouse 15,280.6 proof gallons of grain alcohol for shipment to Joseph E. Seagram & Sons, Inc., pursuant to a purchase agreement. At the time of the withdrawal of the industrial alcohol from the bonded warehouse, Midwest paid the United States excise taxes thereon in the amount of $137,525.40. This tax-paid alcohol was loaded aboard a tank car and consigned to a point in Pennsylvania. On July 25, 1949, while being transported by one of the trains of the Pennsylvania Railroad, and on the lines of that company, the tank car containing the alcohol was derailed and overturned. As a result of this accident 11,549.57 proof gallons of alcohol were lost.

Pursuant to the provisions of the uniform bill of lading, requiring payment for failure to deliver, under which the shipment was made, the carrier, Pennsylvania Railroad paid to the consignee $109,046.73 on account of the alcohol lost during shipment.[1] Of this amount $103,954.50 represented excise taxes paid on the lost alcohol. Thereafter, the Pennsylvania Railroad requested Midwest to file a claim for refund with the Commissioner of Internal Revenue seeking a return of taxes paid on the destroyed alcohol. This claim was rejected on August 4, 1950, by the Commissioner on the ground that "[t]here is no provision of law for the refunding of tax where the spirits have been lost by casualty after the tax ascertained to be due has been paid."

On or about May 19, 1953, the Pennsylvania Railroad took an assignment from Midwest and Hunter-Wilson Distilling Company, the consignee of the

1. Under the terms of the purchase agreement between Midwest and Seagram, the purchaser advanced an amount equal to the excise tax on the alcohol removed from bond. Seagram had consigned this shipment to Hunter-Wilson Distilling Company and it was to them that the Pennsylvania Railroad made payment for the loss caused by the accident.

alcohol shipment, of all their interest in the lost alcohol "including any and all taxes paid thereon, and any claim against the United States Government for a refund thereof." The Pennsylvania Railroad has been partially indemnified by collection from Aetna Insurance Company and others, also parties to this suit, under insurance contracts in the amount of $53,945.50. By the terms of the insurance policies, and by special subrogation receipts, each of the insurance companies was subrogated to the rights of the Pennsylvania Railroad to the extent of the payment which each company made to the railroad.

Suit was brought on June 4, 1952, under section 3113(a) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 3113(a) in this court by the insurance companies and the Pennsylvania Railroad, for a refund of the tax represented by the loss of the industrial alcohol. This section reads as follows:

> "Whenever any alcohol is lost by evaporation or other shrinkage, leakage, casualty, or unavoidable cause during distillation, redistillation, denaturation, withdrawal, piping, shipment, warehousing, storage, packing, transfer, or recovery, of any such alcohol the Commissioner may remit or refund any tax incurred under existing law upon such alcohol, provided he is satisfied that the alcohol had not been diverted to any illegal use: *Provided, also*, That such allowance shall not be granted if the person claiming same is indemnified against such loss by a valid claim of insurance.[2]"

The Government bases its defense to this action upon three main contentions, which are: (1) No statute provides a refund of taxes paid on distilled spirits where the loss occurs after tax payment; (2) The plaintiffs not having paid the tax may not maintain an action for its refund; (3) A train wreck is not a casualty within the meaning of section 3113 of the Code.

■ *First.* The Government says that section 3113(a) does not allow a refund of tax after its payment. It points out that the tax on alcohol is an excise tax on the manufacture of the spirits and attaches at the time of production, although payment is deferred until the time it is removed from a bonded warehouse. Once it has been removed from bond and the tax paid, the Government contends, no refunds may be made due to any loss. In support of this position the Government cites sections of the Internal Revenue Code dealing with refund of taxes paid on distilled spirits.[3] Section 2901 of the 1939 Code, 26 U.S.C.A. § 2901 allows refund of tax on distilled spirits, and has generally been interpreted by the courts as not allowing refund after the tax has been paid and the alcohol withdrawn from bond, see Erie Railroad Company v. United States, Ct.Cl., 156 F.Supp. 908. Cf. Stitzel-Weller Distillery, Inc. v. United States, D.C., 82 F.Supp. 50, affirmed, 6 Cir., 180 F.2d 357. Apparently in order to make sure that such an interpretation of that section was followed by the courts and administrative offices, the Congress, after the *Stitzel-Weller* affirmation, quickly amended section 2901, 64 Stat. 7, in 1950 and provided in its subsection (c) that:

> "* * * Nothing in section 2901 as hereby amended, or as heretofore amended, shall be construed to authorize refund of the tax where the loss occurred after the tax was paid."

This amendment restored to the Code a limitation concerning the refund of taxes on distilled spirits which had existed in prior acts. Rev.Stat. § 3221; 1939 Code § 2901(b), 53 Stat. 341. This same congressional limitation on refunds of tax paid on distilled spirits was mani-

---

2. A corresponding provision now appears in the Internal Revenue Code of 1954, 26 U.S.C. § 5011(c), 26 U.S.C.A. § 5011(c). See footnote 5, infra.

3. Internal Revenue Code, § 2901(c) of 1939 and § 5011(a) (3) of 1954.

fested in section 5011(a) (3) of the 1954 Code.[4]

We think that the Government's reliance on these sections in its attempt to show the intention of Congress with respect to refunds claimed as here under section 3113(a) is misplaced. Section 2901 of the 1939 Code was contained in Chapter 26, Subchapter A, Part IV, 53 Stat. 340. Subchapter A was headed Distilled Spirits and Part IV thereof *Miscellaneous Provisions Relating to Distilled Spirits.* On the other hand, section 3113(a) is found in Subchapter C, part II, which came under the general heading Industrial Alcohol Plants. 53 Stat. 360. Thus the two sections relating to refunds of tax on alcohol cannot be said to be so interrelated that they must be read in *pari materia.* In fact an opposite conclusion seems to be justified.

There was a logical distinction between refunding taxes on distilled spirits and industrial alcohol. The latter was used in industry, commonly rendered nonpotable, and was like any other article of commerce. When not drinkable it did not offer the temptations incident to production, storage, and shipment of the other alcohol. Had Congress intended to provide the same restrictions on refunds of tax paid on industrial alcohol as those applied to distilled spirits, it had ample opportunity to do so.

In enacting section 5011 of the 1954 Code, Congress set forth in that section the requirements for refund of tax on *both* distilled spirits and industrial alcohol. However, the rule against refund after payment of tax is expressly limited to subsection (a) of section 5011 which deals only with distilled spirits. Subsection (c) of section 5011 sets forth the requirements for refund of tax paid on alcohol produced in an industrial alcohol plant and does not forbid a refund after payment of the tax. Section 5011(c) is substantially the same as section 3113(a) of the 1939 Code.[5] The logical conclusion, therefore, would be that Congress did not intend to restrict, either in the 1939 Code or the 1954 Code, refunds of taxes on industrial alcohol to losses occurring prior to the time that the tax is paid.

The legislative history of the provision for refund of industrial alcohol taxes upon loss of the commodity confirms this view. The provision first appeared in the National Prohibition Act of 1919, Title III, Industrial Alcohol, § 14, 41 Stat. 321. It was inserted in the bill in the House, obviously to protect producers of industrial alcohol from losses, and agreed to there and in the Senate without significant discussion. 58 Cong. Rec. 2971; 4893, 4904. At that time, 41 Stat. 317, § 35, all tax provisions on intoxicating liquor were specifically continued in effect. The manufacture of distilled spirits largely for beverage purposes had long been closely supervised and taxed. The provisions for protection of the revenue were detailed and included provisions for recovery or abatement

4. 26 U.S.C. § 5011:
"(a) Distilled spirits lost or destroyed in bond.
\* \* \* \* \*
"(3) *Refund of tax.*—In any case where the tax would not be collectible by virtue of subsection (a) (1), but such tax has been paid, the Secretary or his delegate shall refund such tax. No tax shall be remitted or refunded under this subsection where the loss occurred after the tax was determined (as provided in section 5006(a)), and the spirits withdrawn from bond."

5. 26 U.S.C. § 5011:
"(c) *Loss or destruction of alcohol.* —Whenever any alcohol (produced at an industrial alcohol plant or imported under section 5311), is lost by evaporation or other shrinkage, leakage, casualty, or unavoidable cause during distillation, redistillation, denaturation, withdrawal, piping, shipment, warehousing, storage, packing, transfer, or recovery of any such alcohol, the Secretary or his delegate may remit or refund any tax incurred on such alcohol: *Provided,* That he is satisfied that the alcohol has not been diverted to any illegal use: *Provided further,* That such allowance shall not be granted if the person claiming same is indemnified against such loss by a valid claim of insurance."

of taxes on distilled spirits only while in bond.[6] The omission of the restrictions as to industrial alcohol can only be explained by the less likelihood of tax violations from its handling. As set out above, this difference between distilled spirits and industrial alcohol has continued down to this time. When section 5011(c), *supra*, footnote 5, the present provision, was before Congress the Committee Reports on the Internal Revenue Code said, as to the subsection:

"Subsection (c), 'Loss or destruction of alcohol,' is existing law (see sec. 3113(a)) except that the parenthetical statement '(produced at an industrial alcohol plant or imported under section 5311)' has been inserted following the words 'Whenever any alcohol' at the beginning of the subsection, and the words 'under existing law' were deleted in the phrase 'may remit or refund any tax incurred under existing law upon such alcohol'. The parenthetical insertion is made to distinguish between alcohol produced at industrial alcohol plants or imported and high proof spirits produced at distilleries, in order that the loss provisions of the subsection may not be construed as applying to such spirits produced at registered distilleries. The deletion of the words 'under existing law' is made for the purpose of clarity. [U. S. Code Congressional and Administrative News, 83d Cong., 2d sess., Vol. 3, House Report—Detailed Discussion of Bill, pp. 4476–4477; Senate Report, p. 5134.]"

6. Rev.Stat. § 3221:
    "The Secretary of the Treasury, upon the production to him of satisfactory proof of the actual destruction by accidental fire or other casualty, and without any fraud, collusion, or negligence of the owner thereof, of any distilled spirits, while the same remained in the custody of any officer of internal revenue in any distillery warehouse, or bonded warehouse of the United States and before the tax thereon has been paid, may abate the amount of internal taxes accruing thereon, and may cancel any warehouse bond, or enter satisfaction thereon, in

In Erie Railroad, supra, this court had occasion to discuss refunds of tax on distilled spirits under the Revenue Code of 1939. The plaintiff in that case was seeking refund under a situation quite like the one now presented. There is, however, one major and controlling difference between that case and this. There the refund was sought with respect to alcohol *not* produced in an industrial alcohol plant. As it was stated, Congress clearly did not intend to allow a refund on those distilled spirits after payment of tax. Section 2901(c). This is not now the case before us and with respect to claims under section 3113(a) of the 1939 Code we hold that refund of the tax owed is not barred because the loss occurred after payment of the tax.

■ *Second.* The Government urges that the plaintiffs are not the correct parties to maintain suit for refund. As previously pointed out, the Pennsylvania Railroad suffered the loss because of the liability imposed upon it by its shipping contract. We think that it is a correct party before this court. As the Pennsylvania Railroad was responsible for and paid the loss, it obtained the right by section 3113, which the taxpayer had, to recover any part of the taxes in order to extinguish or mitigate its loss. This section does not limit recovery to the taxpayer as did section 2901(b) of the 1939 Code and section 5011(a) (2) of the 1954 Code. Subrogees were not excluded. Cf. Niagara Fire Ins. Co. v. United States, D.C., 76 F.Supp. 850, Instead it speaks of "the person claiming same." The railroad paid the consignee for its

whole or in part, as the case may be. And if such taxes have been collected since the destruction of said spirits, the said Secretary shall refund the same to the owners thereof out of any moneys in the Treasury not otherwise appropriated."
    The basic law is in Rev.Stat. (1878), Title XXXV, Internal Revenue, Ch. 4, Distilled Spirits. It is sufficient to add that right up to the adoption of the National Prohibition Act there was no relaxation of the rigor of the control of the production of distilled spirits or of the adoption of amendments to carry out the legislative purposes. E. g., 40 Stat. 308.

loss suffered through the casualty. Therefore the railroad bore the loss instead of the owner who had paid the tax for the producer in accordance with the purchase contract. The right of the Pennsylvania arose as a result of subrogation, and the agreement executed between Pennsylvania, Midwest and Hunter-Wilson did no more than express in words what was already in effect by operation of law.

The Government loses nothing by such a subrogation. It would have been liable to the taxpayer for the loss if he were still the owner and is equally liable to the railroad which bore the owner's burden. The case is much like United States v. American Tobacco Co., 166 U.S. 468, 17 S.Ct. 619, 620, 41 L.Ed. 1081. There American recovered from the United States the value of stamps destroyed by fire for the benefit of its insurance carriers. The suit was brought under Rev. Stat. § 3426, as amended, 20 Stat. 327, 349, in the name of American Tobacco, the taxpayer, because that statute called for refund "to the owner thereof." 166 U.S. at page 470, 17 S.Ct. at page 620. But the insurance carrier, because of its payment to American, was subrogated to the taxpayer's claim against the United States. "The suit is properly brought in the name of the insured for the use of the insurers, but the cause of action rests on the rights of the [insured]." 166 U.S. at page 474, 17 S.Ct. at page 621.

In the present case, the carrier, the Pennsylvania Railroad, being liable to the owner by the terms of its bill of lading, on payment thereof became subrogated to the claim against the United States of the owner of the industrial alcohol, subject to all defenses the United States had against the owner, the consignee.[7] This subrogation is not through any statute but by virtue of the nature of the carrier's obligation under its bill of lading. When the owner is made whole, its right to salvage or recovery against third parties passes to the carrier and the carrier's insurers. This follows the general principle of subrogation that when one obligated to indemnify an obligee satisfies his contract, the rights of the obligee arising from the transaction against third parties pass to the obligor. Vermilye & Co. v. Adams Express Co., 21 Wall. 138, 22 L.Ed. 609; Hardman v. Brett, C.C., 37 F. 803, 805, 2 L.R.A. 173.[8] It was for this reason, in these very transactions that, to protect the insurers against any claim by the railroad, the consignee's insurance policy contained a clause barring any claim by a carrier through subrogation.[9]

We turn to consider a statutory limitation in section 3113, supra, page 3, on the right to recover for loss by casualty of industrial alcohol during "shipment." This is the proviso, "That such allowance shall not be granted if the person claiming same is indemnified against such loss by a valid claim of insurance." The Government argues without specific reliance on this proviso that the plaintiffs have no standing to sue. The plaintiffs attack the proviso directly. They assert the proviso is unconstitutional in that it works an arbitrary discrimination against insured and uninsured claimants for tax refunds which violates the Fifth Amendment of the Constitution.

7. Phoenix Insurance Co. v. Erie and Western Transportation Co., 117 U.S. 312, 6 S.Ct. 750, 29 L.Ed. 873; Id., 118 U.S. 210, 6 S.Ct. 1176, 30 L.Ed. 128.

8. There is, of course, no bar to the claim against the Government by the anti-assignment statute, 31 U.S.C. § 203, 31 U.S.C.A. § 203. It was an assignment by operation of law which is valid. United States v. Aetna Casualty & Surety Co., 338 U.S. 366, 373, 70 S.Ct. 207, 94 L.Ed. 171.

9. See finding 15 herein. Cf. Phoenix Insurance Co. v. Erie and Western Transportation Co., supra. See Philip Morris & Co., Inc., to Use of Aetna Ins. Co., v. United States, 149 F.Supp. 166, 137 Ct.Cl. 750; Id., 120 F.Supp. 765, 128 Ct. Cl. 153; Stephano Brothers, to Use of Great Am. Ins. Co. v. United States, 89 F.Supp. 693, 116 Ct.Cl. 503, decided under stamp refund sections for tobacco.

The proviso has existed since the first industrial alcohol legislation, section 14, 41 Stat. 321. A similar provision still exists in respect to distilled spirits, 1954 Code, section 5011(a) (4). It originally was passed May 27, 1872, 17 Stat. 162. It was inserted in the original refund bill concerning distilled spirits after a suggestion on the floor that if the taxpayer "should succeed in recovering from the insurance company one-half of the value of the spirits destroyed, it would be inequitable that he should not pay a portion at least of the tax on those spirits." In form it was substantially like the present wording. Instead of the original word "tax," it now reads "loss." The meaning is the same.[10]

■ It may be that as allowance of refund is an act of grace, the tax being payable upon the manufacture or withdrawal of the alcohol, the Congress favored only taxpayers who had suffered loss when the entire transaction was taken into consideration. At any rate we do not find the limitation so arbitrary or unreasonable as to violate the Fifth Amendment. When legislating for the refund of taxes, it is reasonable to classify taxpayers according to whether they did or did not suffer loss.

The right on a casualty to recover a refund covered by section 3113 passed from taxpayer to purchaser to consignee (Hunter-Wilson Distilling Co., a subsidiary of Joseph E. Seagram & Sons, Inc.). When the Pennsylvania Railroad paid Hunter-Wilson for the loss, as required by its bill of lading, it was subrogated, as we held above, to the consignee's right to tax refund. It became the "person claiming same," entitled to sue to recover, the real party in interest of Rule 17 of the Rules of Civil Procedure, 28 U.S.C.A.

The amount paid by the Pennsylvania Railroad to the consignee was $109,046.73 (finding 8). The Pennsylvania Railroad received from its own insurers, also plaintiffs here, $53,945.50. It sues for $50,000. Two issues arise as to the statutory limitation as to indemnification:

■ A. Was the owner-consignee "indemnified against such loss by a valid claim of insurance"? If so, its subrogee cannot recover because a subrogee takes only the rights of the creditor. The Pennsylvania Railroad must pay the consignee the loss because of the bill of lading. It is a debtor-creditor relation akin to insurance but we do not think it is the sort of obligation covered by the statutory phrase—"a valid claim of insurance." It is not the "insurance" referred to on the floor of Congress at the time of its original adoption. That was a usual fire insurance policy carried by the distiller. Congress evidently did not have a bill of lading in mind when it allowed tax recovery in section 3113 for loss in "shipment." Every carrier has the common law liability for "failure to transport safely goods intrusted to its care." Chesapeake & Ohio Railway Company v. Thompson Manufacturing Company, 270 U.S. 416, 422, 46 S.Ct. 318, 319, 70 L.Ed. 654. We do not think the bill of lading gave the consignee "a valid claim of insurance" within the meaning of the act. Therefore the Pennsylvania Railroad gained by subrogation the consignee's right to recover from the Government.

B. Does the same rule apply to the plaintiff companies who insured the Pennsylvania Railroad against loss and thereby on payment to the railroad in turn became subrogated to its claim against the Government? We do not think that it does. The proviso of section 3113(a), page 3, supra, says "such allowance shall not be granted if the person [Pennsylvania] claiming same is indemnified against such loss by a valid claim of insurance." The Pennsylvania Railroad, the claimant, held valid claims of insurance for $53,945.50 paid by plaintiff companies. It cannot recover this because of the section 3113 proviso so, of course, its insurance company subrogees cannot either. They have only the rights of the Pennsylvania Railroad.

10. Congressional Globe, 42d Cong., 2d sess., pp. 2359 and 2385.

*Third.* Finally, the Government urges that section 3113, see 159 F.Supp. 834, supra, does not cover a loss by train wreck. Proper diligence by the carrier would have avoided the loss. Therefore it was "negligence, not a casualty," which the Government urges is "an event which a human cannot prevent," citing Crystal Springs Distillery Co. v. Cox, 6 Cir., 49 F. 555. The statute there in question, Rev.Stat. § 3221, allowed recovery for "destruction by accidental fire or other casualty." The court refused recovery from loss by warpage and undiscoverable wormholes. He concluded such incidents were not a "casualty."

Under this statute, section 3113 with its use of shrinkage, leakage, casualty, or unavoidable cause during "shipment * * * [or] transfer," we cannot but conclude that a loss by train wreck is a loss by "casualty" in the ordinary meaning of the word and as covered by the statute.

Internal Revenue taxation places on producers the duty to pay certain exactions for the support of the Government. Producers must pass these heavy luxury taxes on to the consumer, the ultimate bearer. When casualty intervenes, after the tax is paid, the choice is with Congress whether to compel the producer to bear the loss or to refund the amount on terms dictated by legislation. We think the Pennsylvania Railroad has met the requirements of the Congress and should recover.

It is the opinion of this court that plaintiff The Pennsylvania Railroad Company may recover the tax paid on the alcohol lost by the wreck during shipment over its lines, for which it was liable, to the extent that such loss was not indemnified by insurance. The amount of recovery under the petition, together with interest as provided by law, will be determined pursuant to Rule 38(c), 28 U.S.C.A. It is further held that plaintiff Aetna Insurance Company and the other plaintiff insurance companies may not re-cover, and the petition as to them will be dismissed.

It is so ordered.

JONES, Chief Judge, and MADDEN, and LITTLETON, Judges, concur.

WHITAKER, Judge (dissenting).

The correct decision in this case is not as plain as in Erie Railroad Company v. United States, Ct.Cl., 156 F.Supp. 908, but, even so, I do not think it was the intent of Congress to permit a refund of a tax on account of a casualty occurring after the alcohol had been withdrawn from bond and the tax had been paid.

Most of the occasions enumerated in section 3113(a) of the Internal Revenue Code of 1939, permitting a remission or refund of the tax, are things occurring before withdrawal from bond. For instance, "shrinkage", "leakage", "unavoidable cause during distillation, redistillation, denaturation"; all these of course, occur prior to withdrawal.

Then the statute mentions "withdrawal". I take it this means withdrawal from bond, and refers to a loss in this process. "Piping", I suppose, refers to transmission of the alcohol by pipe from distillery to warehouse or within one or the other. "Storage" must mean storage in the warehouse. "Transfer" and "shipment" I would suppose mean transfer and shipment before withdrawal from Government control. After withdrawal and the payment of the tax thereon, the Government's interest in the alcohol ceases. What happens to it thereafter is no concern of the Government.

I can conceive of no reason why the Congress should have intended to direct a refund of the tax, if the alcohol was destroyed after it had passed out of the hands of the Government and into the uncontrolled possession of the owner.

I think section 3113(a) should be construed to refer to events happening before withdrawal from bond and payment of the tax.

I respectfully dissent.