**Samuel M. OPPER, Plaintiff,**

v.

**HANCOCK SECURITIES CORPORATION, Defendant.**

United States District Court
S. D. New York.
Feb. 15, 1966.

Kramer, Bandler & Labaton, New York City, for plaintiff.

Kimmelman & Perkiss, New York City, for defendant.

FRANKEL, District Judge.

Plaintiff, an investor and trader in stocks, sues defendant broker for damages allegedly suffered from defendant's failure to execute faithfully an order to sell 3,000 shares of the stock of Medallion Pictures Corporation. The claim is that the order to sell was given on August 3, 1964; that defendant's president falsely assured plaintiff through the remainder of that month that he was making efforts to effect the sale; that defendant meanwhile was selling large quantities of Medallion shares for its own account; and that plaintiff finally found it necessary, early in September 1964, to sell the shares through another broker at prices substantially below those he would have realized had defendant fulfilled its fiduciary obligations. The complaint counts on both the New York law of agency and the anti-fraud provisions in sections 10(b) and 15(c) (1) of the Securities Exchange Act of 1934 (48 Stat. 891 and 895, as amended, 15 U.S.C. §§ 78j and 78o), together with the implementing Rules (10b—5 and 15cl—2, 17 C.F.R. §§ 240.10b—5 and 240.15cl—2) of the Securities and Exchange Commission. The court has both diversity jurisdiction, 28 U.S.C. § 1332, and exclusive jurisdiction under the Securities Exchange Act of 1934, § 27, 48 Stat. 902, as amended, 15 U.S.C. § 78aa. Upon the facts as hereinafter found, we hold that plaintiff is entitled to judgment on either or both of his legal theories.

## I. The Facts

Plaintiff, an insurance agent, has been an active trader and investor in stocks for about thirty years. For some ten years preceding August of 1964, he had been a customer of William Mordecai Grossman, who worked for half of that period as a customer's man in various brokerage houses. In 1959 Grossman and Mortimer Tover formed defendant brokerage corporation, with Grossman as president and secretary, and Tover as vice president and treasurer. Plaintiff dealt with defendant through Grossman, continuing their long-standing personal relationship.

Defendant is a registered broker-dealer under the Securities Exchange Act of 1934 (see 15 U.S.C. § 78o—3) and is registered with the National Association of Securities Dealers, Inc. (N.A.S.D.), as a broker-dealer. In its brokerage capacity defendant buys and sells securities for its customers; as a dealer it trades for its own account. It selects its own role, either as broker or dealer, unilaterally in each transaction, and on many occasions it executes customers' orders by buying or selling for its own account. In confirming transactions to customers, its confirmation notices indicate whether defendant has conducted each transaction as "principal" or "broker," depending on whether defendant has dealt for its own account. Seeking profits from the sale of securities to its customers, defendant commonly earns a mark-up on such sales. On the other hand, in selling stocks for its customers, defendant frequently

charges no brokerage commission, offering this service as an inducement to continued custom.

 Defendant over the years dealt extensively in over-the-counter securities —i. e., securities not listed on one of the national exchanges. In some instances defendant functioned as a "market-maker" in a particular security, reporting for quotation "bid" and "asked" prices to indicate, respectively, amounts for which it proposed to buy or sell the stock. From time to time, defendant also served as "sponsor" of an over-the-counter stock, a capacity in which it devoted special efforts to advertising and trading to maintain the market for such stock.

For some time prior to the genesis of the present controversy, defendant had been a sponsor, and one of some eight or ten market-makers, of the over-the-counter stock of Medallion Pictures Corporation. Over a period of some years it had sold plaintiff 3,000 shares of this stock. During August of 1964 there were about 575,000 shares outstanding in the hands of the public, and defendant held varying inventories in its own account ranging as high as 13,924 shares.

On August 3, 1964, having been advised by another broker that the time was propitious for such a step, plaintiff telephoned Grossman (following their usual practice and the common practice in the industry) and placed an order for the sale of his 3,000 shares of Medallion. At this point we encounter what defendant posed as a substantial issue of fact at the trial. According to plaintiff's testimony, the order he placed on August 3 (and kept urging defendant to execute during the rest of that month) was an order "at the market"—i. e., to sell the shares at the best price obtainable. Grossman, on the other hand, testified that it was a "limit order"—to sell only at a price of 19 or higher. In our view of the case, plaintiff is entitled to judgment either way. Nevertheless, it is appropriate at this point to treat, and record the court's finding upon, this conflict in the testimony.

The short of the question, assuming it matters, is that we credit plaintiff's testimony on this, not Grossman's. Plaintiff was a straightforward and entirely credible witness. His testimony was consistent with the overall pattern of events on which the parties had no essential factual disagreement. It is not possible to say as much of Grossman.

Grossman tended to be grudging and evasive as he sparred with the question whether plaintiff had really given him any order at all. He said early in his direct testimony that he did not consider plaintiff to have given "a firm order." He stressed that plaintiff had not sent in his share certificates when he allegedly placed his order. Seizing upon this, Grossman said he would have considered that plaintiff had placed "a firm order if the stock were in [defendant's] possession with the firm order at 19." In the teeth of this testimony, the evidence showed that the defendant did not regularly (though it did sometimes) obtain plaintiff's certificates before executing and confirming to him an order to sell. And it may well be, in any event, that a court in New York City could notice judicially that brokers do not normally, or even commonly, deem delivery of the customer's certificates a condition for the effective placement of a sell order.

As his testimony proceeded through cross-examination, Grossman allowed that plaintiff had in fact told him "to sell this 3,000 at 19." He said he "considered it an order at that time." Amplifying or qualifying, he said it was deemed by him to be an order "[a]t that time on that day. * * *" His attempts to confine the order's effectiveness to "that day" of August 3 alone were incredible (1) as he stated them on the stand and (2) in light of the other record circumstances, including his admissions that he continued repeatedly on the days following to discuss the proposed sale (and explain his delay in making it) with plaintiff. This infirmity, along with others, infects Grossman's attempt to refute plaintiff's assertion that he had actually placed a normal market order on August 3.

Grossman's credibility was marred in other respects. Giving his expert, though concededly interested, opinion, he said that a sale or offer by defendant of as many as 3,000 Medallion shares in August of 1964 would have had "a very destructive" or "a completely disastrous effect" upon the market. Yet it is an important and undisputed fact in the case (to be considered more fully below) that defendant in fact sold far more than this quantity for its own account in that month.

In addition to the contrast between the witnesses on the stand, there is basis in the documents and pertinent regulations for preferring plaintiff's version. It was shown that defendant made a practice of noting on the upper portion of its daily trading pads unexecuted orders from its customers. These notations showed the name of the stock and the number of shares involved. In recording only such limited information, defendant's practice failed to comply with S.E.C. regulations requiring that the broker make a memorandum, for each order or instruction, of "the terms and conditions * * *, the account for which entered [and] the time of entry. * * *" 17 C.F.R. § 240.17a—3(6). The vital point here, however, is that defendant had no record whatever of an August 3 order from plaintiff. Having conceded finally, after a course of testimony not notable for candor, that plaintiff had in fact placed an order, defendant was unable to produce even the legally insufficient record it normally prepared. It satisfies sense and fairness to treat this as an added circumstance favoring plaintiff's over defendant's version of the order.

To repeat, then, we think it should make no difference for the outcome of the case, but we find that plaintiff placed a market order, seeking the best price defendant could obtain, rather than a limit order, on August 3, 1964.

From this point the picture unfolds in its material aspects with no significant conflicts in the testimony. Grossman told plaintiff, on August 3 and subsequent days, that the sale of 3,000 shares of Medallion could not be effected advantageously if they were sold in a block. Plaintiff said it would be all right with him if the shares were disposed of over the course of a few days.

On Friday, August 7, having received no confirmation, plaintiff called Grossman, who reported that he had been unable to dispose of the shares. Plaintiff reiterated that it was not necessary for his purposes that the shares be traded as a block. Grossman promised to continue his efforts on plaintiff's behalf.

Twice during the following week plaintiff called Grossman again and complained that the sale had not been consummated. Plaintiff expressed his impatience and urged Grossman to treat the matter as an urgent one. Grossman reported that he was continuing to encounter difficulties and that he was planning trips to various cities outside New York for the purpose of soliciting banks and funds as potential customers for the stock. Throughout these and later conversations, it may be noted, the parties understood that defendant was serving as a selling agent in the sense of being charged with seeking some third-party customer for plaintiff's shares. There was never a suggestion that defendant was itself being solicited by plaintiff to buy his stock.

During the period of the foregoing conversations, defendant was buying and selling Medallion shares for its own account. In our view of the case, its sales are matters of special moment. Between August 4 and 7, defendant sold 1,910 shares at prices from 18½ to 19½. On August 10 and 11 it sold to retail customers from its own inventory 6,000 shares at 19½ and another 1,300 shares at 18¾.

Grossman called plaintiff at his home on Sunday, August 16, and said he was going out of town to sell the stock. This time, he said, he was certain of success. He promised to call plaintiff when he returned. Plaintiff said he could dispose of the shares through another broker if Grossman was unable to accomplish the sale, but the latter gave assurances that

this was unnecessary. The assurances were repeated during the ensuing week. Meanwhile, on August 18, defendant sold another 5,100 of its own shares at prices between 18 and 18¾.

On August 24, defendant's inventory of Medallion stock, which had been as high as 12,303 earlier in the month, reached a low of 3,809 shares. The next day, Grossman testified, other brokers were beginning to "lean on" him because they judged that his sponsorship of Medallion was "weak." By the close of business on August 27, defendant's inventory had increased to 13,924 shares. The next day the price of the stock plunged to the vicinity of thirteen dollars per share.

Plaintiff called to remonstrate with Grossman on Friday, August 28, and again on the following Monday, August 31. He demanded that defendant confirm to him a sale of his shares at approximately the price they had commanded earlier in the month. He threatened legal action. Grossman said on the latter day, "You might destroy me, but you'll never collect a cent."

After his talk with Grossman on the 31st, plaintiff placed with another broker an order to sell his shares. The 3,000 were sold in installments by September 4 at prices from 9¾ to 11½ for an aggregate price of $31,013.80.

## II. *The Applicable Law*

■ Despite the vigor of defendant's contentions, this is a simple, and indeed a flagrant, case of faithless and fraudulent performance by a fiduciary. Through its president, Grossman, defendant undertook to find, and represented for a month that it was earnestly seeking, a purchaser for plaintiff's shares—a bank or a fund or somebody, somewhere. Meanwhile, unknown to plaintiff, defendant was selling thousands of its own shares, disposing of over 6,000 at a price of $19.50 per share. Defendant had undertaken an "agency" in the law's most elementary sense of the term, with all the fiduciary responsibilities attendant upon this status. In preferring itself over plaintiff, defendant became liable on bedrock

principles that defendant does not presume to question frontally. See, *e. g.*, Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1 (1928); Johnson v. Winslow, 155 Misc. 170, 279 N.Y.S. 147 (N.Y.Co.1935), affirmed, 246 App.Div. 800, 285 N.Y.S. 1075 (1st Dep't 1936), affirmed, 272 N.Y. 467, 3 N.E.2d 872 (1936); Pepper v. Litton, 308 U.S. 295, 311, 60 S.Ct. 238, 84 L.Ed. 281 (1939); Irving Trust Co. v. Deutsch, 73 F.2d 121 (2d Cir. 1934), cert. denied, 294 U.S. 708, 709, 55 S.Ct. 405, 79 L.Ed. 1243 (1935).

■ While one theory is enough to require judgment for plaintiff, he is also (or, more precisely, *a fortiori*) correct in claiming under the anti-fraud provisions of the Securities Exchange Act of 1934, §§ 10(b) and 15(c) (1) (15 U.S.C. §§ 78j(b) and 78o(c) (1), and the S.E.C. regulations thereunder, 17 C.F.R. §§ 240.-10b—5 and 240.15cl—2. It has been settled for a long time that when Congress struck in this legislation at the particularized problems of "manipulative, deceptive, or otherwise fraudulent" practices in the securities markets, it meant to reach frauds that "may take on more subtle and involved forms than those in which dishonesty manifests itself in cruder and less specialized activities." Archer v. Securities and Exchange Commission, 133 F.2d 795, 803 (8th Cir. 1943), cert. denied, 319 U.S. 767, 63 S.Ct. 1330, 87 L.Ed. 1717 (1943); Charles Hughes & Co. v. Securities & Exchange Commission, 139 F.2d 434, 437 (2d Cir. 1943), cert. denied, 321 U.S. 786, 64 S.Ct. 781, 88 L.Ed. 1077 (1944); see also S.E.C. v. Capital Gains Research Bureau, 375 U.S. 180, 194, 84 S.Ct. 279, 11 L.Ed.2d 257 (1963). We are concerned in this case with a garden variety instance of deception, nondisclosure, and self-preferment by a broker purporting to act as a selling agent. There should be no serious question that defendant violated its duties under the 1934 Act, *e. g.*, Barnett v. United States, 319 F.2d 340 (8th Cir. 1963); Hughes v. Securities and Exchange Commission, 85 U.S.App.D.C. 56, 174 F.2d 969 (D.C.Cir.1949); Norris & Hirshberg v. Securities & Exchange Com-

mission, 85 U.S.App.D.C. 268, 177 F.2d 228 (1949); Shearson, Hammill & Co., S.E.C. Release No. 7743, Nov. 12, 1965, CCH Fed. Sec. L. Rep. (Current), ¶ 77.-306, esp. pp. 82, 519–20; cf. O'Neill v. Maytag, 339 F.2d 764, 767–768, 769 (2d Cir. 1964), and that these violations would be sufficient without more to sustain plaintiff's suit, J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964).

Resisting the foregoing conclusions, defendant makes two points: First, that it dealt with plaintiff as a "principal" and therefore had no fiduciary responsibilities to him. Second, that "the market" never reached 19 (the point of plaintiff's alleged limit order), so that defendant was free to sell its own shares at 19½ to "retail customers" while holding plaintiff's and assuring him that it was seeking a buyer at a suitable price. Both arguments are impressively wrong.

▮ In the third volume of his illuminating treatise on Securities Regulation (2d ed., 1961), Professor Loss has a subchapter heading (p. 1500) which reads " 'Now I'm a Principal, Now I'm an Agent.' " The rubric, and the discussion which follows it,[1] aptly characterizes defendant's first argument here. The asserted basis for the argument is the fact that in many, though by no means all, of the transactions it executed over the years for plaintiff, defendant's confirmations recited that it had made the trades "as principal." Specifically, out of a total of 41 transactions with plaintiff placed in the record by defendant, 29 showed defendant acting "as principal" while twelve showed defendant "as broker." What is more significant for our purposes is the evidence relating to instances when plaintiff was selling shares to or through defendant. The transactions defendant introduced show only five sales by plaintiff to defendant "as principal," while ten were sales made by defendant "as broker" on plaintiff's behalf. It is not easy to discern in all of this the "pattern" of dealing "as principal" for which defendant contended at the trial.

Far more meaningful, in any event, is the testimony of defendant's own expert, and general knowledge the parties agree we may consult, that the confirmation-slip label "as principal" or "as broker" was as a practical matter for defendant's unilateral determination.[2] Conforming to S.E.C. requirements,[3] it served only to show whether the broker in the particular trade had chosen to buy from plaintiff or sell to him for its own account. While the disclosure served, and serves, as an

---

1. Namely, treatment of "the status of a broker-dealer who, although purporting to act as principal rather than agent, places himself in a position of trust and confidence with his customer." Ibid.

2. Confirming what is specifically established by the evidence in this case, see Report of Special Study of Securities Markets of the Securities and Exchange Commission, Part II, H.R. Doc. No. 95, Part II, 88th Cong. 1st Sess. 552, 611–12 (hereinafter cited as "*Special Study*").

3. The pertinent regulation, 17 C.F.R. § 240.15cl–4, says:
 "The term 'manipulative, deceptive, or other fraudulent device or contrivance,' as used in section 15(c) (1) of the act is hereby defined to include any act of any broker or dealer designed to effect with or for the account of a customer any transaction in, or to induce the purchase or sale by such customer of, any security (other than United States Tax Savings Notes, United States Defense Savings Stamps, or United States Defense Savings Bonds, Series E, F and G) unless such broker or dealer, at or before the completion of each such transaction, gives or sends to such customer written notification disclosing (a) whether he is acting as a broker for such customer, as a dealer for his own account, as a broker for some other person, or as a broker for both such customer and some other person; and (b) in any case in which he is acting as a broker for such customer or for both such customer and some other person, either the name of the person from whom the security was purchased or to whom it was sold for such customer and the date and time when such transaction took place or the fact that such information will be furnished upon the request of such customer, and the source and amount of any commission or other remuneration received or to be received by him in connection with the transaction."

obviously desirable protection for the customer, it is equally obvious that the choice of function in this respect cannot be (and was never intended to be) a means by which the broker may elect whether or not the law will impose fiduciary standards upon him in the actual circumstances of any given relationship or transaction.

From plaintiff's view, for the purposes that concern us here, it made no difference whether defendant operated "as principal" or "as broker" in the presently immaterial sense of these terms on the confirmation form. Nor is it essential to our conclusion on this point, though it is striking, that in the teeth of its counsel's legal argument, defendant's president, Grossman, acknowledged on the stand that he generally considered himself to be functioning as plaintiff's "broker" over the years. What is decisive in the end is that the facts of the case disclose an "agency" relationship in the most basic and unmistakable sense of both the common law and securities law. Barnett v United States, 319 F.2d 340, 344–345 (8th Cir. 1963); Norris & Hirshberg v. Securities & Exchange Commission, 85 U.S.App.D.C. 268, 177 F.2d 228 (1949); Hughes v. Securities and Exchange Commission, 85 U.S.App.D.C. 56, 174 F.2d 969, 976 (1949).[4]

Defendant's remaining argument, while it also takes a bit to state and reject, is equally insubstantial. The claim, as noted earlier, is that since plaintiff had placed a limit order at 19, and since "the market" never reached that figure, defendant was free to find "retail customers" and sell them its own shares at prices up to 19½. It might be a sufficient answer that plaintiff proved a market order rather than a limit order. But defendant fares no better if we accept its version of the facts and consider its regrettable theory on that basis.

██ As used in this contention, the "market" is the range of "bid" and "asked" prices reported by brokers making the market in over-the-counter securities. These figures, published daily by the National Quotation Bureau in what initiates call the "pink sheets," represent, respectively, the approximate prices at which such brokers may be ready to purchase or sell the stock The reported figures are no certain indication of prices at which trades have been, or will be, made. Both the quoted prices and the prices actually paid in specific sales are likely to fluctuate in the course of a day and to be inaccurate reflectors even before they are published.[5]

██ Defendant, it will be recalled, as a sponsor of Medallion stock, was a principal factor among the eight or ten brokers whose reported figures comprised the pink sheet data. It now says it could prefer itself, while representing that it was looking everywhere for private customers for plaintiff, because neither it nor any other broker published a "bid" price of 19. If this were the law, the system of over-the-counter quotations would serve as a tool for specialized frauds rather than an item in the apparatus of fair disclosure contemplated by the federal program of securities regulation.[6]

The parties produced expert witnesses to do battle over the question whether the "custom and practice" of the trade gave sanction to defendant's view. Neither expert seemed entirely detached from the

---

4. The calibre of defendant's contrary position is reflected in its primary and extensive reliance upon Coolidge v. Old Colony Trust Co., 259 Mass. 515, 156 N.E. 701 (1927), a decision which is broadly distinguishable in its facts and surely prehistoric in terms of the now famliar principles governing securities dealers.

5. See Special Study, Part II, 570–74, 596–600; 2 Loss, Securities Regulation 1278–1283 (2d ed., 1961).

6. As appears from the *Special Study* and elsewhere, there may, indeed, be defects in the operations of the over-the-counter markets. So far as we know, however, this is the first time a broker has claimed the law's blessing for the kind of thesis propounded here.

interests of the contestants.[7] At any rate, leaving aside the explicit testimony by plaintiff's expert that trade usage would condemn what defendant did, we find no absolution for defendant in the opinions of its own expert. To be sure, he did offer the view that brokers are not required to "cross orders" for over-the-counter securities. On the other hand, he concurred on the stand with the published views of his employer, the N.A.S.D., that:

> "One of your functions in executing [an] order for your customer is to seek out the best market, and then to execute to his best advantage."

\* \* \* \* \* \*

> "The integrity of the industry can be maintained only if the fundamental principle that a customer should at all times get the best available price which can reasonably be obtained for him is followed."[8]

■ If it were essential, we would find from the evidence that defendant did not follow the standards of the securities marketplace in selling its own shares rather than plaintiff's at 19½. In the last analysis, however, the dispositive judgment on this point is one of law rather than fact. Had defendant succeeded in showing that it followed a customary course, the first litigation of such a practice would be the occasion for its outlawry. Cf. Vermilye & Co. v. Adams Express Co., 21 Wall. 138, 146, 88 U.S. 138, 146, 22 L.Ed. 609 (1874); Cudahy Packing Co. v. Narzisenfeld, 3 F.2d 567, 572 (2d Cir. 1924); The Farmers' and Mechanics' National Bank of Buffalo v. Sprague, 52 N.Y. 605, 607–608 (1873); Johnson v. Winslow, 155 Misc. 170, 186–187, 279 N.Y.S., 147, 164–165 (N.Y.Co. 1935), affirmed, 246 App.Div. 800, 285 N.Y.S. 1075 (1st Dep't 1936) affirmed,

272 N.Y. 467, 3 N.E.2d 872 (1936). We have noted already that the duties of a securities broker are, if anything, more stringent than those imposed by general agency law. All that is necessary here is to hold defendant to standards that would govern an agent for the sale of potatoes.

■ We arrive, then, at the question of damages. In his complaint, plaintiff sought recovery of $25,263.70, the claimed difference between the amount he finally realized for his shares and the amount they would have brought at 18¾ (the latter being a "bid" figure commonly reported by defendant in August of 1964). Having learned in discovery and the trial of defendant's sales at 19½ on August 10 and 11, 1964, plaintiff has used this higher figure to increase the amount of the prayer by $2,250. Plaintiff is not limited, of course, by his *ad damnum* clause; he is entitled to recover the damages he proved. Couto v. United Fruit Co., 203 F.2d 456, 457 (2d Cir. 1953); Wendy v. McLean Trucking Company, 279 F.2d 958, 959 (2d Cir. 1960). We hold that plaintiff should have the higher amount.

■ Between August 4 and Friday, August 7, 1964, defendant sold 1,910 of its own Medallion shares at prices from 18½ to 19½. Then, while representing that it was seeking to sell plaintiff's shares, it sold 6,000 shares on August 10 and 11 at 19½. Since defendant was actively misrepresenting and defaulting when it made these sales at 19½, it seems fair and reasonable to give plaintiff the benefit of the opportunity his agent misappropriated. Cf. Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1 (1928); Mayer v. Monzo, 221 N.Y. 442, 446–447, 117 N.E. 948, 950 (1917); Restatement (Second), Agency, § 403.

---

**7.** Plaintiff's expert headed a brokerage firm with which plaintiff traded and which, until a quarrel over compensation, had formerly employed defendant's principals, Grossman and Tover. Defendant's expert, subpoenaed by name to appear for the N.A.S.D., was an attorney serving that Association as Assistant Secretary to the Uniform Practice Committee and Assistant Secretary to the Foreign Committee. It was shown in his cross-examination that he had an account with defendant and that he and his relatives had traded with defendant in Medallion stock.

**8.** Special Study, Part II, 623 n. 225, 624.

Accordingly, plaintiff is entitled to recover $27,486.20, with interest from August 11, 1964, and appropriate costs of this action. Counsel will submit proposed judgments on three days' notice.