

Opinions of the United
States Court of Appeals
for the Third Circuit

1-30-1998

# Newton v. Merrill Lynch

Precedential or Non-Precedential:

Docket 96-5045

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Newton v. Merrill Lynch" (1998). *1998 Decisions.* Paper 22.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/22

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed January 30, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 96-5045

KENNETH E. NEWTON; MLPF&S CUST. BRUCE ZAKHEIM
IRA FBO BRUCE ZAKHEIM

v.

MERRILL, LYNCH, PIERCE, FENNER & SMITH, INC.;
PAINEWEBBER INC.; DEAN WITTER REYNOLDS
(D.C. No. 94-cv-05343)

JEFFREY PHILLIP KRAVITZ

v.

DEAN WITTER REYNOLDS, INC.
(D.C. No. 95-cv-00213)

MLPF&S Cust. FPO -- Bruce Zakheim IRA FBO Bruce
Zakheim, Jeffrey Phillip Kravitz, and Gloria Binde r,
Appellants

On Appeal From the United States District Court
For the District of New Jersey

Argued October 24, 1996

BEFORE: STAPLETON and NYGAARD, Circuit Judges ,
and MAZZONE,* District Judge

Reargued En Banc October 29, 1997

_____

*Hon. A. David Mazzone, United States District Judge for the District of
Massachusetts, sitting by designation.

BEFORE: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, SCIRICA, NYGAARD, ALITO, ROTH and LEWIS, Circuit Judges

(Opinion Filed January 30, 1998)

          Norman S. Poser
          Brooklyn Law School
          250 Joralemon Street
          Brooklyn, NY 11210

          Karen L. Morris (Argued)
          Morris & Morris
          1105 North Market Street
          Suite 1600
          Wilmington, DE 19801
           Attorneys for Appellants

          Matthew D. Anhut
          Jonathan N. Eisenberg
          Kirkpatrick & Lockhart
          1800 Massachusetts Avenue, N.W.
          Washington, D.C. 20036-5891
           Attorneys for Appellee
           Merrill, Lynch, Pierce,
           Fenner & Smith, Inc.

          Joseph A. Boyle
          Kelley, Drye & Warren
          5 Sylvan Way
          Parsippany, NJ 07054

          Bruce Coolidge
          Robert B. McCaw (Argued)
          Wilmer, Cutler & Pickering
          2445 M Street, N.W.
          Washington, D.C. 20037-1420
           Attorneys for Appellee
           PaineWebber, Inc.

2

Frank M. Holozubiec
Kirkland & Ellis
153 East 53rd Street
Citicorp Center
New York, NY 10022
 Attorney for Appellee
 Dean Witter Reynolds

Richard H. Walker
Eric Summergrad
Susan F. Wyderko
Jacob H. Stillman
Mail Stop 6-6
Securities & Exchange Commission
450 Fifth Street, N.W.
Washington, D.C. 20549
 Attorneys for Amicus Curiae
 Securities & Exchange
 Commission

OPINION OF THE COURT

STAPLETON, Circuit Judge:

I.

Plaintiff-Appellants are investors who purchased and sold securities on the NASDAQ market, the major electronic market for "over-the-counter" securities, during the two year period from November 4, 1992 to November 4, 1994 ("the class period"). The defendants are NASDAQ market makers. NASDAQ is a self-regulating market owned by the National Association of Securities Dealers ("NASD"), subject to oversight by the Securities and Exchange Commission ("SEC").

An "over-the-counter" market like NASDAQ differs in important respects from the more familiar auction markets, like the New York and American Stock Exchanges. The NYSE and AMEX markets are distinguished by a physical exchange floor where buy and sell orders actually "meet," with prices set by the interaction of those orders under the

3

supervision of a market "specialist." In a dealer market like NASDAQ, the market exists electronically, in the form of a communications system which constantly receives and reports the prices at which geographically dispersed market makers are willing to buy and sell different securities. These market makers compete with one another to buy and sell the same securities using the electronic system; NASDAQ is, then, an electronic inter-dealer quotation system.

In a dealer market, market makers create liquidity by being continuously willing to buy and sell the security in which they are making a market. In this way, an individual who wishes to buy or sell a security does not have to wait until someone is found who wishes to take the opposite side in the desired transaction. To account for the effort and risk required to maintain liquidity, market makers are allowed to set the prices at which they are prepared to buy and sell a particular security; the difference between the listed "ask" and "bid" prices is the"spread" that market makers capture as compensation.

The electronic quotation system ties together the numerous market makers for all over-the-counter securities available on NASDAQ. All NASDAQ market makers are required to input their bid and offer prices to the NASD computer, which collects the information and transmits, for each security, the highest bid price and lowest ask price currently available. These prices are called the"National Best Bid and Offer," or NBBO. The NASD computer, publicly available to all NASDAQ market makers, brokers and dealers, displays and continuously updates the NBBO for each offered security.

Plaintiffs allege that technological advances made it feasible during the class period for the defendant market makers to execute orders at prices quoted on private on-line services like SelectNet and Instinet and that those prices were frequently more favorable to their investor clients than the NBBO price. According to plaintiffs, the defendants regularly used these services and knew that prices better than NBBO were often available through them. Even though they knew that their investor clients expected them to secure the best reasonably available price,

4

plaintiffs say, the defendants executed plaintiffs' orders at the NBBO price when they knew that price was inferior and when they, at the same time, were trading at the more favorable price for their own accounts. In this way, they were able to inflate their profit margins at the expense of their investor clients. This practice is alleged to violate section 10 of the Securities Act of 1934, 15 U.S.C.S 78j, and Rule 10b-5 promulgated thereunder, 17 C.F.R. S 240.10b-5.

The plaintiffs also charge defendants with two other violations of section 10 and Rule 10b-5. Market makers who simultaneously hold a market order for both sides of a transaction may obtain more favorable prices than the NBBO by "crossing" these in-house orders. Transactions handled in this way are executed within the spread, giving both the purchaser and seller a better price. Similarly, a customer order can be matched by a market maker with an in-house limit order on the other side of the transaction. Since a limit order specifies a particular price at which to execute a transaction, matching another customer order at that price may beat the currently displayed NBBO quote for that security. Plaintiffs allege that the failure of the defendants to execute orders of their clients in these ways when feasible constitutes a fraudulent practice because, by executing at the NBBO rather than matching customer orders, the defendants capture the full market "spread" as a fee for their services without incurring any actual risk in the transaction.

II.

The defendants filed a motion to dismiss for failure to state a claim upon which relief could be granted. At the direction of the district court, this motion was converted into a motion for summary judgment, which was ultimately granted. See In re Merrill Lynch Securities Litigation, 911 F. Supp. 754 (D.N.J. 1995). The district court rested its decision on two principal grounds. First, the court determined that the defendants made no misrepresentation. Though recognizing that the defendants, by accepting plaintiffs' orders, impliedly represented that they intended to execute those orders in conformity with the "duty of best

execution," the court considered the scope of this duty sufficiently ill-defined that execution at the NBBO could not, as a matter of law, be found inconsistent with the duty. The court concluded that in the face of uncertainty about the scope of defendants' duty of best execution, holding them liable would be "highly imprudent." 911 F. Supp. at 771. Second, the court held that, even if defendants made a material misrepresentation, they could not, as a matter of law, have acted with the requisite scienter.

To state a claim for securities fraud under S 10 of the Securities Act of 1934 and Rule 10b-5, plaintiffs must demonstrate: (1) a misrepresentation or omission of a material fact in connection with the purchase or sale of a security; (2) scienter on the part of the defendant; (3) reliance on the misrepresentation; and (4) damage resulting from the misrepresentation. See Sowell v. Butcher & Singer, Inc., 926 F.2d 289, 296 (3d Cir. 1991). Because plaintiffs have demonstrated that a genuine issue of material fact exists as to the elements of their securities fraud claim, we will reverse the district court.

III.

The parties agree that a broker-dealer owes to the client a duty of best execution. They further agree that a broker-dealer, by accepting an order without price instructions, impliedly represents that the order will be executed in a manner consistent with the duty of best execution and that a broker-dealer who accepts such an order while intending to breach that duty makes a misrepresentation that is material to the purchase or sale. The parties differ, however, on whether a trier of fact could conclude from this record that the implied representation made by the defendants included a representation that they would not execute at the NBBO price when prices more favorable to the client were available from sources like SelectNet and Instinet.

As we explain hereafter, this difference can be resolved only by determining whether, during the class period or some portion thereof, it was feasible for the defendants to

6

execute trades through SelectNet and Instinet when prices more favorable than the NBBO were being quoted there. This is a matter concerning which the record reflects a material dispute of fact. If such prices were reasonably available and the defendants, at the time of accepting plaintiffs' orders, intended to execute them solely by reference to the NBBO, they made a material misrepresentation in connection with the purchase or sale of the securities involved. If a finder of fact could infer, in addition, that the defendants' implied representation was knowingly false or made with reckless indifference, it would follow that summary judgment for the defendants was inappropriate.

The duty of best execution, which predates the federal securities laws, has its roots in the common law agency obligations of undivided loyalty and reasonable care that an agent owes to his principal.[1] Since it is understood by all that the client-principal seeks his own economic gain and the purpose of the agency is to help the client-principal achieve that objective, the broker-dealer, absent instructions to the contrary, is expected to use reasonable efforts to maximize the economic benefit to the client in each transaction.

The duty of best execution thus requires that a broker-dealer seek to obtain for its customer orders the most

_____

1. See, e.g., Hall v. Paine, 112 N.E. 153, 158 (Mass. 1916) ("broker's obligation to his principal requires him to secure the highest price obtainable"); Restatement of Agency (Second) S 424 (1958) (agent must "use reasonable care to obtain terms which best satisfy the manifested purposes of the principal"). See also Opper v. Hancock Securities Corp., 250 F.Supp. 668, 676 (S.D.N.Y.) ("[T]he duties of a securities broker are, if anything, more stringent than those imposed by general agency law."), aff 'd, 367 F.2d 157 (2d Cir. 1966). Moreover, as the district court correctly recognized, the best execution duty "does not dissolve when the broker/dealer acts in its capacity as a principal." 911 F.Supp. at 760. Accord E.F. Hutton & Co., Exchange Act Rel. No. 25887, 49 S.E.C. 829, 832 (1988) ("A broker-dealer's determination to execute an order as principal or agent cannot be `a means by which the broker may elect whether or not the law will impose fiduciary standards upon him in the actual circumstances of any given relationship or transaction.' ") (citation omitted).

7

favorable terms reasonably available under the circumstances. See, e.g., Sinclair v. SEC, 444 F.2d 399, 400 (2d Cir. 1971) (fiduciary duty requires broker-dealer "to obtain the best available price" for customers' orders); Arleen W. Hughes, 27 S.E.C. 629, 636 (1948) ("A corollary of the fiduciary's duty of loyalty to his principal is his duty to obtain . . . the best price discoverable in the exercise of reasonable diligence."), aff 'd sub nom. Hughes v. SEC, 174 F.2d 969 (D.C. Cir. 1949). Accord Order Execution Obligations, Exchange Act Release No. 37,619A, 61 Fed. Reg. 48290, 48322 (Sept. 12, 1996) ("Final Rules"). That is, the duty of best execution requires the defendants to execute the plaintiffs' trades at the best reasonably available price.[2] While ascertaining what prices are reasonably available in any particular situation may require a factual inquiry into all of the surrounding circumstances, the existence of a broker-dealer's duty to execute at the best of those prices that are reasonably available is well-established and is not so vague as to be without ascertainable content in the context of a particular trade or trades.

As the SEC has recognized on a number of occasions, the scope of the duty of best execution has evolved over time with changes in technology and transformation of the structure of financial markets.[3] For example, before the

---

2. Other terms in addition to price are also relevant to best execution. In determining how to execute a client's order, a broker-dealer must take into account order size, trading characteristics of the security, speed of execution, clearing costs, and the cost and difficulty of executing an order in a particular market. See, e.g., Payment for Order Flow, Exchange Act Release No. 33,026, 58 Fed. Reg. 52934, 52937-38 (Oct. 13, 1993). When the plaintiffs state that better"prices" were reasonably available from sources other than the NBBO, we understand that to mean that, given an evaluation of price as well as all of the other relevant terms, the trade would be better executed through a source of liquidity other than the NBBO (e.g. SelectNet, Instinet, in-house limit orders or market orders held by the defendants, or limit orders placed by the public in the Small Order Execution System). Similarly, for convenience, we use the phrases "best reasonably available price" and "best terms" interchangeably.

3. See, e.g., Final Rules, 61 Fed. Reg. at 48322-23 ("The scope of this duty of best execution must evolve as changes occur in the market that

8

creation of NASDAQ, a broker in an over-the-counter market satisfied her duty of best execution by contacting at least three market makers prior to executing a client's order. See Order Execution Obligations, Exchange Act Release No. 36,310, 60 Fed. Reg. 52792, 52793 (Oct. 10, 1995) ("Proposed Rules"). With the advent of NASDAQ and the NBBO computer system providing instant access to the best bid and offer available nationwide, the standard for satisfying the duty of best execution necessarily heightened. After the class period, the SEC issued rules that altered the definition of the NBBO to include consideration of many of the alternative sources of liquidity that plaintiffs claim should have been consulted during the class period, such as SelectNet and Instinet. See Final Rules, 61 Fed. Reg. at 48306-16. Prospectively, at least, this heightened the standard still further.

Because the scope of the duty of best execution is constantly evolving and because the "reasonably available" component of the duty is fact dependent, broker-dealers have long been required to conform customer order practices with changes in technology and markets. For example, the NASD's Rules of Fair Practice, adopted in 1968, required brokers in the over-the-counter market to "use reasonable diligence to ascertain the best inter-dealer market for the subject security and buy or sell in such market so that the resultant price to the customer is as favorable as possible under the prevailing market conditions." NASD Manual (CCH), art. III S 1, P 2151.03 (1995) (Interpretation A). Included in the factors used to satisfy the requirement of "reasonable diligence" are both "the number of primary markets checked," and the "location and accessibility to the customer's broker-dealer of primary markets and quotations sources." Id.

Almost a year before the end of the class period, the SEC staff issued a report entitled "Market 2000: An Examination
_____

give rise to improved executions for customer orders, including opportunities to trade at more advantageous prices. As these changes occur, broker-dealers' procedures for seeking to obtain best execution for customer orders also must be modified to consider price opportunities that become `reasonably available.' ").

9

of Current Equity Market Developments." This report notes that the SEC has consistently taken the position that the evolving nature of the markets requires a broker-dealer to "periodically assess the quality of competing markets to ensure that its order flow is directed to markets providing the most advantageous terms for the customer's order." Market 2000 Report, 1994 SEC LEXIS 136, *11-12. As the term "periodically assess" suggests and as the SEC confirms in its amicus briefing before us, this segment of the report was not speaking to the issue of whether, during the class period, the duty of best execution included a requirement that broker-dealers engage in an order-by-order analysis of competing markets. It does, however, expressly recognize a duty on the part of broker-dealers to periodically examine their practices in light of market and technology changes and to modify those practices if necessary to enable their clients to obtain the best reasonably available prices.

The plaintiffs' orders did not specify the price at which they should be executed. It is a reasonable inference that plaintiffs, in placing their orders, sought their own economic advantage and that they would not have placed them without an understanding that the defendants would execute them in a manner that would maximize plaintiffs' economic benefit from the trade. Given the objective of the agency and the regulatory background we have reviewed, we conclude that a trier of fact could infer that the defendants' acceptance of the orders was reasonably understood as a representation that they would not be executed at the NBBO price when better prices were reasonably available elsewhere. Accordingly, we must examine the record evidence relevant to whether prices quoted on private on-line services like SelectNet and Instinet were reasonably available during the class period and whether those prices were more favorable than the NBBO when plaintiffs' orders were executed.

The evidence pointed to by plaintiffs indicates that (1) SelectNet and Instinet were in existence throughout the class period; (2) the quotations reported by these services reflected buyers and sellers ready to trade at the quoted prices; (3) the defendants themselves actively traded on

10

SelectNet and Instinet during the class period; and (4) other respected members of the brokerage community, since before the class period, have regarded these services as providing reasonably available prices and have executed orders through them when the prices reported were more favorable to the client than the NBBO price. In addition, the plaintiffs have tendered expert testimony confirming the reasonable availability of execution sources other than the NBBO during the class period.

With respect to whether SelectNet and Instinet prices were more favorable at the time their orders were executed, plaintiffs point to an SEC study of prices during the three month period from April through June 1994. The SEC found that "approximately 85% of the bids and offers displayed by market makers in Instinet and 90% of the bids and offers displayed on SelectNet were at better prices than those posted publicly on NASDAQ." Final Rules, 61 Fed. Reg. at 48308. Plaintiffs have also tendered evidence of a few trades executed for them by defendants at the NBBO where evidence of contemporaneous offers on Instinet and SelectNet indicate that lower prices were available. Plaintiffs have filed a Rule 56(f) affidavit indicating that they need discovery in order to provide similar evidence with respect to the remainder of their trades.4

To be sure, the defendants, with record support, insist that consulting other sources besides the NBBO would have added substantial expense and delay to the execution of plaintiffs' orders, more than offsetting any improvements that might have been available in terms of price. 5 This,

_____

4. Defendants suggest that the lack of evidence of injury in all plaintiffs' transactions supports an affirmance on the basis of lack of standing. We believe the evidence we have reviewed in text supports plaintiffs' claim to standing. Plaintiffs submitted evidence that would warrant a finding that several trades were made on their behalf when better prices were contemporaneously available from other sources. The SEC study of 1994 prices suggests that, more likely than not, there were other trades in this category. In any event, the plaintiffs have filed a Rule 56(f) affidavit that would preclude a summary judgment for defendants on this issue at this time.

5. In particular, the defendants rely upon the existence during the class period of the Small Order Execution System ("SOES"). SOES is an

however, does nothing more than create a material dispute of fact which we are not permitted to resolve in favor of the defendants at this juncture.

We believe the evidence is sufficient to allow a reasonable trier of fact to conclude that, by the time of the class period, both technology and over-the-counter markets had developed to a point where it was feasible to maximize the economic benefit to the client by taking advantage of better prices than the NBBO. Summary judgment for defendants on this element of plaintiffs' claim was therefore not appropriate.

IV.

As we have noted, recovery on a federal securities fraud claim requires a showing of scienter: a deliberate or reckless misrepresentation of a material fact. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976); Eisenberg v. Gagnon, 766 F.2d 770, 776 (3d Cir. 1985). The alleged misrepresentation here is an implied representation made by the defendants when they agreed to execute the plaintiffs' orders that they intended to maximize the

_____

electronic routing system that was created in 1984 to allow orders from small investors to be automatically executed at the NBBO. Defendants claim that since the NBBO was the exclusive source for trades executed through SOES, the duty of best execution was presumptively met for these trades. The evidence to which the defendants point supports their position that execution at the NBBO was a common practice in handling orders from small investors. It does not alone, however, require a finding that trades at better prices through SelectNet or Instinet were not reasonably available even for small orders or that a broker-dealer's duty of best execution was automatically discharged by executions through SOES. While size is undoubtedly a relevant factor in determining the scope of the duty of best execution, for summary judgment purposes we find the state of the record with respect to small orders no different than
the record with respect to other orders. The affidavit of Richard Y. Roberts, who served as the chairman of the SEC throughout the class period, notes that, to his knowledge, the SEC did not take the position that execution through SOES automatically satisfied the duty of best execution, and indicates that, in his opinion, such a position would be contrary to several SEC releases. At any rate, not all of plaintiffs' orders
were executed through SOES.

12

plaintiffs' economic gain in the transaction. Since the defendants knew of the plaintiffs' profit motivation, they must have understood, according to the plaintiffs, that plaintiffs would expect them to obtain a price more advantageous to the plaintiffs than the NBBO when one was readily available. If the defendants intended not to act in a manner consistent with this expectation when they accepted the orders and yet did not so advise plaintiffs, plaintiffs insist that the defendants can be found to have made an implied representation that they knew to be false.

We believe that a reasonable trier of fact couldfind this chain of inferences persuasive based on a straight forward economic analysis of the plaintiffs' relationship with the defendants. In addition, however, plaintiffs rely upon evidence showing that respected members of the brokerage community recognized, even prior to the class period, that trades were readily available from sources other than the NBBO and that their clients expected them to take advantage of those sources whenever it would benefit the client. See, e.g., Declaration of Paul M. Lacy [A 718]; Declaration of Junius W. Peake [A 755]; Declaration of Richard Y. Roberts [A 775]. Moreover, the plaintiffs have shown that an SEC study found clear evidence of a two-tiered market during the class period, in which NASDAQ market makers routinely traded at one price with retail clients like the plaintiffs and at a better price for themselves through quotation services like SelectNet and Instinet. See Final Rules, 61 Fed. Reg. at 48307-08. They have further shown that the possibility that the duty of best execution might require resort to sources other than the NBBO was being actively debated during the class period and that that debate ultimately resulted, shortly after the class period, in a regulation effectively requiring as much. Id.

All of this would allow a reasonable trier of fact to find that the defendants' misrepresentation--namely, that they would execute plaintiffs' trades in a manner maximizing plaintiffs' economic gain--was at least reckless, if not intentional. See Healey v. Catalyst Recovery of Penn., Inc., 616 F.2d 641, 649 (3d Cir. 1980) (defining recklessness as an extreme departure from ordinary care).

13

Defendants have countered with affidavits of other respected members of the brokerage community stating that their practice during the class period was the same as that of the defendants. This evidence could, of course, be regarded by a trier of fact as probative of the defendants' state of mind when they accepted plaintiffs' orders. But these affidavits do no more than raise a material issue of fact as to whether the defendants knew of the expectation plaintiffs claim to have had; they do not settle the matter.

At trial, the defendants would certainly be entitled to argue to the jury that, because of industry practice, they thought their clients would expect them to execute only at the NBBO or that they never thought about their clients' expectations. Moreover, any evidence, derived from knowledge of industry practice or elsewhere, that the plaintiffs were generally aware of the defendants' exclusive reliance on the NBBO would, of course, be quite probative of whether the plaintiffs had the expectations they claim. But the defendants, in elevating the practice of a segment of the industry to be outcome determinative, lose sight of the fact that the basis for the duty of best execution is the mutual understanding that the client is engaging in the trade--and retaining the services of the broker as his agent --solely for the purpose of maximizing his own economic benefit, and that the broker receives her compensation because she assists the client in reaching that goal. Based on this mutual understanding and the absence of any express limitations on the brokers' responsibility, a trier of fact could find that the defendants, although intending to execute with sole reference to the NBBO, understood that they were expected to utilize sources other than the NBBO when a better price was readily available.6

_____

6. The foregoing analysis is generally applicable to plaintiffs' claim that it was reasonably feasible for defendants to "cross" customer orders on opposing sides of a transaction and match customer orders with in-house limit orders. Plaintiffs' record support, including affidavits from respected members of the investment community, raises a disputed issue of material fact as to whether these practices were reasonably feasible during the class period. If the defendants intended to execute plaintiffs' orders at the NBBO despite the reasonable availability of these alternative pricing sources, and if the defendants acted knowingly or with reckless indifference to the falsity of their material representations, then plaintiffs have a securities fraud claim for these practices as well.

14

V.

In concluding as we do, we are not unmindful of the fact, deemed determinative by the district court, that execution of customer orders at the NBBO was a practice "widely, if not almost universally followed" in the securities industry during the class period. 911 F. Supp. at 772. Under the district court's logic, a Section 10(b) defendant would be entitled to summary judgment even if it were her regular practice to knowingly violate the duty of best execution, so long as she could identify a sufficient number of other broker-dealers engaged in the same wrongful conduct to be able to argue in good faith that the underlying duty was "ambiguous." We cannot accept an analysis that would produce such a result.

Even a universal industry practice may still be fraudulent. See Chasins v. Smith, Barney & Co. , 438 F.2d 1167, 1171-72 (2d Cir. 1970) (non-disclosure of widespread industry practice may still be non-disclosure of material fact); Opper v. Hancock Securities Corp., 250 F. Supp. 668, 676 (S.D.N.Y.) (industry custom may be found fraudulent, especially on first occasion it is litigated) aff 'd, 367 F.2d 157 (2d Cir. 1966); see also Vermilye & Co. v. Adams Express Co., 88 U.S. 138, 146 (1874). Indeed, the SEC recently completed an investigation in which it found that certain practices by NASDAQ market makers, not at issue here, were fraudulent even though they were widely followed within the industry. See Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934 Regarding the NASD and the NASDAQ Market, 1996 SEC LEXIS 2146 (Aug. 8, 1996).

As defendants emphasize, the practice of exclusive reliance on the NBBO has never been held to be fraudulent by any court or regulator. On the other hand, there is no statute, rule, regulation, or interpretation, by the SEC or by a court, that authoritatively establishes that, for all trades, the NBBO exhausted the category of "reasonably available prices" during the class period. This absence of precedent did not, however, absolve the district court of the duty to resolve the plaintiffs' securities fraud claim once it was presented in this suit.

15

"In the final analysis, ultimate responsibility for construction and enforcement of the securities laws must rest with the court." Langert v. Q-1 Corp. , Fed. Sec. L. Rep. (CCH) P 94,445, at 95,540, 1974 WL 377 (S.D.N.Y. Mar. 15, 1974). The district court was not deprived of this enforcement authority just because no court or regulator had previously chosen to exercise such authority with respect to the practice challenged here. See, e.g., Chasins, 438 F.2d at 1171-72 (finding that defendant's failure to disclose its market maker status was material omission under Section 10(b), despite fact that SEC had never previously held that such disclosure was required).

VI.

On the record before us, we believe a reasonable trier of fact could conclude that the defendants misrepresented that they would execute the plaintiffs' orders so as to maximize the plaintiffs' economic benefit, and that this misrepresentation was intentional or reckless because, at the time it was made, the defendants knew that they intended to execute the plaintiffs' orders at the NBBO price even if better prices were reasonably available. A reasonable trier of fact could thus find scienter with respect to a material misrepresentation, as well as the other elements essential to a Section 10(b) fraud claim. Accordingly, we will reverse the summary judgment entered by the district court and remand for further proceedings.

A True Copy:
Teste:

     Clerk of the United States Court of Appeals
     for the Third Circuit

16